**UNITED STATES of America and Gerald T. Culver, Petitioners,**

v.

**E. O. BUCK, Temporary Receiver for W. L. Moody & Co., Bankers (Unincorporated) Respondent,**

v.

**Shearn MOODY, Jr., Intervenor.**
**Misc. No. 72–G–3.**

United States District Court,
S. D. Texas,
Galveston Division.

Jan. 16, 1973.

James H. Jeffries, III, Tax Div., U. S. Dept. of Justice, Washington, D. C., Anthony J. P. Farris, U. S. Atty., and William L. Bowers, Jr., Asst. U. S. Atty., Houston, Tex., for petitioners.

Charles Sapp, and W. Robert Brown, Lidell, Sapp, Zivley & Brown, Houston, Tex., for respondent.

V. W. McLeod, and Benjamin R. Powel, McLeod, Alexander, Powel & Apffel, Galveston, Tex., for intervenor.

## MEMORANDUM AND ORDER

NOEL, District Judge.

This is a suit to obtain judicial enforcement of an administrative summons. Petitioners are the United States of America and Gerald T. Culver, a Special Agent with the Intelligence Division of the Internal Revenue Service (IRS). Respondent is E. O. Buck in his capacity as Temporary Receiver for W. L. Moody & Co., Bankers (Unincorporated), a sole proprietorship owned and formerly operated by Intervenor, Shearn Moody, Jr. Receiver was appointed in an action brought against Bank and Intervenor by the Securities and Exchange Commission (SEC) and docketed as Civil Action No. 71–G–167. The summons required Receiver to appear before Culver and produce certain records of the Bank. Receiver did not comply with the summons and this enforcement proceeding was instituted pursuant to Sections 7402(b) and 7604 of Title 26, the United States Code.

Moody, the taxpayer whose records are being sought, requested and was granted permission to intervene as the real party at interest. Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). Counsel for Intervenor actively presented the case against enforcement while Receiver's counsel, appropriately, has stood by, awaiting the Court's decision. Oral testimony was received on December 4 and 11. In addition, Intervenor and Petitioners have sumitted briefs.

## FINDINGS OF FACT

1. On July 10, 1972, pursuant to an SEC order authorizing an investigation, Larry Burks, Esq., an attorney for the SEC, prepared a subpoena duces tecum addressed to W. L. Moody & Co., Bankers (Unincorporated). The subpoena requested access to substantially all Bank records. Because the Bank is a sole proprietorship owned by Intervenor, its records are the personal property and records of Moody. They have been so considered by all parties. The rights and liabilities of Moody and Bank are coincident. Moody is the Bank and the Bank is Moody. The Bank is only one of Moody's numerous assets held by the Receiver, pursuant to this Court's order.

2. On July 10, E. Douglas McLeod, Executive Vice President of Bank, was served with the SEC subpoena at the Bank, Tremont and Church Streets, Galveston, Texas. McLeod was fully advised of his constitutional rights. McLeod offered to provide immediate access to the records. Nonetheless, James E. Sims, Esq., SEC attorney in charge, postponed a request for compliance until an attorney for Moody could be present. Upon later arrangement between Sims and representatives of Moody, July 13 was selected as the date upon which compliance would commence.

3. On July 10, and in the presence of Sims, McLeod attempted to contact several attorneys who had represented Moody in matters concerning the Bank. McLeod finally reached A. R. Schwartz, an attorney. Schwartz conferred with Sims on July 10 and 11, at which time he stated that he was not qualified to properly counsel Moody in the matter and indicated to Sims that the firm of Sams, Anderson, Alper & Spencer, of Miama, Florida, would represent Moody. The firm had previously represented Moody. On July 12, Roger Bridges, Esq., of that firm arrived in Houston, and acting as attorney for Moody, conferred with Sims. James Wohlenhaus, a Moody employee and adviser, had told McLeod that Bridges would represent Moody.

4. Between July 10 and 13, McLeod talked by telephone to Moody and met with Moody at his ranch. Moody knew of the SEC subpoena and of McLeod's intention to comply with it. Although he expressed anger and aggravation over the investigation, Moody did not direct McLeod to resist the subpoena. Moody did nothing to restrict the scope of or compliance with the SEC investigation. McLeod's compliance with the SEC subpoena was authorized by Moody.

5. On July 13 Messrs. Sims and Burks, SEC attorneys, and John Arnold, an SEC accountant, appeared at Bank to demand compliance with the subpoena. Messrs. McLeod, Bridges and Trenton Torregrossa, Vice President and Cashier of Bank, were present. The proceedings were recorded (Moody Exhibit 3). Although Bridges, legal counsel for Moody, acknowledged his familiarity with Moody's constitutional privilege, he did not assert the privilege for Moody and made no objection to Moody's compliance with the SEC subpoena. Bridges stated that compliance was not to be considered a waiver of any right Moody might have, but did not identify any particular right as being reserved. The Court finds that Moody complied with the SEC subpoena after careful consideration by and upon advice of duly authorized and competent counsel.

6. The SEC order authorizing the investigation (Government Exhibit 2) stated facts which if true would constitute violations of the Securities Act of 1933, as amended, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78 et seq. The order identified the specific sections of the laws involved, to wit: Sections 5(a), 5(c) and 17(a) of the Securities Act, and Section 10(b) of the Securities Exchange Act, together with Rule 10b–5 adopted pursuant thereto. Violations of said sections carry with them criminal sanctions, 15 U.S.C. § 77v and 15 U.S.C. § 78ff. McLeod and Moody's counsel, Bridges, read and fully understood the implications of the order.

7. At the July 13 proceeding, Sims advised those present that the cited statutes concerned unregistered sales of securities and statutory fraud. Sims also informed McLeod and Bridges that if violations of other federal laws became evident, "the subjects of the investigation could be charged with violations of those other laws." Thus, the Court finds that Moody through his agents and from their communications to him knew the criminal implications of the SEC investigation; and with such information, acted upon the advice of competent counsel.

8. On August 1 and 2, Moody appeared at Bank and asked Burks several questions concerning the SEC investigation. Burks declined to answer Moody's questions and told him the SEC was not there to help Moody. He suggested that Moody should confer with his attorney. Upon advice of counsel, Moody signed a short letter (Government Exhibit 3), dated August 3, which recited knowledge of the subpoena and stated, "it is agreeable with me for this investigation by the Securities and Exchange Commission to continue until further notice is given by me to the contrary." No contrary notice was given.

9. The investigation by the SEC in July and August of 1972 was very thorough. Commission representatives reviewed all Bank files and surveyed the contents of every desk. The SEC microfilmed a substantial part of the records located in the Bank. The investigators were provided an office in the bank building. Moody's employees assisted in locating and providing records for the investigators as requested.

10. The only records located in Bank which were not available for examination were two safety deposit boxes which were assigned to Moody as his personal boxes, as distinguished from certain boxes designated for the Bank's use. Upon request of a Moody employee who advised that the boxes contained Moody's personal records, the SEC agreed not to review the contents of those boxes. It did not do so.

11. On August 28, 1972, pursuant to a subpoena served August 8, Moody accompanied by attorneys Jerry G. Hill and Frank V. Ghiselli, Jr., appeared for oral examination before SEC officers Robert F. Watson, Larry Burks, and James E. Edwards, at Fort Worth, Texas. At the outset Moody was advised of the nature of the investigative examination and of his constitutional rights. Moody fully answered several questions

concerning his holdings in various companies. Nonetheless, when asked a question concerning one or more securities transactions with one James Brewer, acting upon advice of his counsel Hill, Moody claimed the Fifth Amendment privilege against self-incrimination. Although Moody indicated a willingness to answer other questions, the SEC officers declined to ask further questions and terminated the oral examination. The invocation of the Fifth Amendment was to the single question and not a blanket assertion of the privilege.

12. Sims was informed on August 28, that the Commission, after review of the investigation, had authorized filing a civil lawsuit against Moody. The suit was to allege securities law violations in Moody's operation of the Bank and seek injunctive relief.

13. On August 29, Sims and Hill, accompanied by his client, Moody, met with the Court in chambers. They apprised the Court of past events and the imminent SEC suit against Moody. All were concerned about the financial condition of Moody's Bank. Hill and Moody expressed fear that filing the SEC lawsuit would cause a bankrupting run by anxious depositors, resulting in serious financial loss to Moody as well as to the depositors. Hill described attempts being made to convert certain of Moody's assets into cash, in order to meet the demands of depositors should a run occur. Upon the basis of these representations and with approval of higher SEC authority, Sims agreed to refrain from filing suit immediately.

14. On September 6, having concluded that the assets would not be converted into cash as proposed, Sims requested another meeting with the Court. After this meeting attended by Sims and Hill, the lawsuit was filed, Civil Action No. 72–G–167.

15. The Complaint, Final Judgment, and Order Appointing Temporary Receiver were filed simultaneously on September 6. The wording of the Final Judgment and the Order had been the subject of intensive negotiations between Hill and Sims. The Final Judgment enjoined further violations of the securities laws. Moody consented and joined in its submission. The Order Appointing Temporary Receiver required that Receiver "take charge of all of defendant W. L. Moody & Co., Bankers Unincorporated's assets and property, tangible or intangible, wherever located." Moody neither consented to nor opposed the latter Order. Moody did not assert any constitutional right or privilege with respect to any aspect of the assets and property (including the Bank records, of which the Receiver took charge pursuant to said Order). In substance, the transfer of such property and assets (including the Bank records), was voluntary. Prior to September 11, no reference to any private papers of Moody was made to the Court or to the Receiver.

16. On September 10 or 11, during a meeting with the Court, Hill advised the Court that the two safety deposit boxes, mentioned above, contained private papers of Moody as distinguished from Bank records, as to which Moody desired to assert his Fifth Amendment privilege. Hill requested that the two boxes be sealed and immunized from inspection by either the Receiver or the SEC, pursuant to said privilege. The Court orally ordered the Receiver to comply with the request. The boxes were sealed and have not been opened either by the SEC or Receiver. This is the only occasion in which the Fifth Amendment was invoked during the proceedings in Civil Action No. 72–G–167.

17. Robert Coyle, Revenue Agent with the Audit Division of the Internal Revenue Service (IRS) has been investigating the correctness of Moody's tax returns for 1969 and 1970, two of the years involved in this proceeding. Copies of all Moody's records as requested by Coyle have been supplied for his examination in the offices of Moody's public accounting firm. Coyle has copied many of such records. Coyle has not recommended a criminal investigation of

Moody's affairs. The IRS administrative subpoena and this enforcement proceeding did not result from Coyle's work.

18. Gerald T. Culver, Special Agent with the Intelligence Division of the IRS, issued and served the subject summons. The Intelligence Division generally investigates possible fraud by taxpayers, which implies potential criminal sanctions. Culver's investigation of Moody's affairs did not begin until September 1972. Information of possible fraud came to the Intelligence Division from a government agency other than the IRS. The Audit Division of the IRS did not initiate this investigation by the Intelligence Division.

19. The IRS calls its activities with respect to Moody a Joint Investigation because a Revenue Agent and a Special Agent work on it concurrently. The Court finds that at this time the investigation is joint in name only. Culver did not confer with Coyle before issuing the summons or filing suit. He has reviewed neither the records which Coyle has copied nor the other contents of Coyle's work files. There has been no coordinated action between the two agents. Culver's investigation, which is the subject of this proceeding, is entirely criminal in nature with the object of discovering and proving tax fraud by the taxpayer.

20. Many of the records here sought by Culver have already been made available to and copied by Coyle. To require the taxpayer to again produce the records for IRS inspection and copying involves duplication of effort and expense. It is not unusual for the Internal Revenue Service, in the interest of time, to ask taxpayers for records which are already on file with the Service. While inconvenient to the taxpayer, this procedure has not been shown to impose an unreasonable burden in this case. It does not constitute harassment of the taxpayer Moody.

21. Some but not all of the records sought have been copied by the SEC during its investigation and are on twelve rolls of microfilm which have been made available by SEC to the IRS. The records sought are relevant to determining the taxpayer's income and tax liability. The IRS has a legitimate interest in seeking access to the complete, original documents rather than relying on incomplete copies made for purposes other than tax investigation. Although the records sought are numerous, the IRS summons is specific in its description of the exact records requested.

22. The IRS summons was served on Receiver October 31, 1972. It called for his appearance on November 19, 1972, during which time Receiver was actively engaged in distributing funds to Bank depositors, pursuant to the order of this Court. An early distribution to depositors was considered a goal of the highest priority by the Court. The preparation necessary to comply with the summons would have interfered with the accomplishment of this goal. In failing to comply with the summons, the Receiver acted with the utmost regard for his responsibilities to both Moody and the depositors of Bank.

23. The Petition to Enforce the Summons was filed November 17. At that time the Receiver and his attorneys were involved in preparation of a Final Record to the Court. Consent to the petition would have prevented the early completion of this important task. Again, the Court finds that the Receiver acted responsibly in resisting the summons during November.

24. If the Court orders compliance with the IRS summons, Receiver will appear before the Special Agent and provide the requested records. The parties have stipulated that the receivership may be terminated without prejudice to the rights of the parties here. Thus if the receivership has ended and the records have been returned to Moody before the Court's order should become final, the records will be subject to discovery to the same extent ordered as if such records were in Receiver's possession and control.

## CONCLUSIONS OF LAW

■ 1. The records sought by the IRS in this proceeding are clearly relevant and material to a determination of Moody's taxable income for the years in question, and therefore the IRS has presented a prima facie case which justifies enforcement of the summons. See United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); Boren v. Tucker, 239 F.2d 767 (9th Cir. 1956).

■ 2. By turning over the records of W. L. Moody & Co., Bankers (Unincorporated) to the Receiver without asserting a Fifth Amendment privilege against self-incrimination (except as to the two safety deposit boxes), Moody lost the right to assert that privilege here. Because the records sought are in the Receiver's hands, Moody cannot legally assert constitutional claims to prevent their production.

■ Generally, the privilege against self-incrimination does not encompass property which the individual has transferred to another person. One claiming the privilege must have possession, title and control over the property sought. When the individual has relinquished possession to another, he can no longer assert the privilege. Thus, this Court held in United States v. Baldridge, 281 F.Supp. 470 (S.D.Tex.1968) (Ingraham, J.):

> The rule is well settled that a party has no standing to invoke the privilege against self-incrimination as to evidence in the possession of another person even though the evidence was originally obtained from the person claiming the privilege and regardless of the incriminating nature of the evidence.

Mr. Justice Powell most recently summarized this legal principle in stating:

> It is important to reiterate that the Fifth Amendment privilege is a *personal* privilege; it adheres basically to the person, not to information which may incriminate him. As Mr. Justice Holmes put it: 'A party is privileged from producing the evidence but not from its production.' Johnson v. United States, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913). The Constitution explicitly prohibits compelling an accused to bear witness 'against himself': it necessarily did not proscribe incriminating statements elicited from another. . . . It is extortion of information from the accused himself that offends our sense of justice.

Couch v. United States, 409 U.S. 322 at 328, 93 S.Ct. 611 at 616, 34 L.Ed.2d 548 (1973), aff'g, 449 F.2d 141 (4th Cir. 1971). See also Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 at 414, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting).

■ The Fifth Amendment privilege against self-incrimination and the Fourth Amendment protection against unreasonable search protect the individual against official invasions of personal privacy. See United States v. White, 322 U.S. 694, 698, 64 S.Ct. 1248, 88 L. Ed. 1542 (1944). They protect the individual's reasonable expectations of security in body, mind and personality. When the individual freely exposes and transmits his thoughts and papers to others, he can have "no legitimate expectation of privacy." Couch v. United States, supra, 409 U.S. at 336, 93 S.Ct. 611. His thoughts and papers are no longer sacrosanct and thus are not entitled to these constitutional safeguards. In legal terms the individual has waived his right to assert these privileges.

■ This result occurs most frequently when a taxpayer leaves his records with a public accountant. When the taxpayer so relinquishes possession of his records, he loses his Fifth Amendment privilege with respect to such records so long as they are out of his possession. He cannot complain if the accountant is summoned to produce those records for the Internal Revenue Service. Couch v. United States, supra.

■ Similarly, the accountant (or in this case, the Receiver) cannot assert a Fifth Amendment privilege because the

records are not incriminating as to him. The general rule is that one cannot assert constitutional rights belonging to another. Bouschor v. United States, 316 F.2d 451 (8th Cir. 1963), states:

> . . . the guarantee against self-incrimination has long been characterized as a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person.

■ The transfer of records from Moody to Receiver was pursuant to court order and in this respect differs from a taxpayer's unilateral transfer of records to his accountant. Nonetheless, the Court has found that Moody voluntarily transferred the records. Although Moody did not agree to the receivership order, neither did he oppose it. In fact, Moody's attorney, Hill, acknowledged that a receivership, if necessary to prevent a run on the Bank, would be in the best interest of Moody. Moreover, after Hill was succeeded by McLeod as Moody's attorney, and after ample time to consider the matter had elapsed, no appeal was taken from the order appointing Receiver. Under these circumstances, the analogy of this case to the accountant cases is appropriate.[1]

■ Furthermore, the transfer of any incriminating evidence to Receiver must be considered voluntary because of Moody's failure to assert his Fifth Amendment privilege as to the transmitted records. Moody asserted the privilege as to two safety deposit boxes and their contents. Those boxes were sealed and their contents were not delivered to Receiver. Other records which Moody or his counsel deemed to be incriminating could have received similar protection. Moody's waiver of the privilege as to other records must be interpreted as a voluntary relinquishment of such other records.

Finally, as a matter of law, the Court concludes that Moody voluntarily transferred his Bank's assets and records to the Receiver. This situation is most analogous to an involuntary bankruptcy in which a court transfers the assets of an individual for the benefit of both creditors and the individual, but without the individual's consent. A series of United States Supreme Court cases involving bankruptcy receiverships and IRS summonses has held that the receiver must comply with the summons and that the Fifth Amendment is not available to the bankrupt taxpayer once he has transferred his assets. E. g., Dier v. Banton, 262 U.S. 148, 43 S.Ct. 533, 67 L.Ed. 915 (1923); In the Matter of Harris, 221 U.S. 274, 31 S.Ct. 557, 55 L. Ed. 732 (1911).

Moody attempts to avoid the result reached in the above cited bankruptcy cases by pointing to the differences between bankruptcy receiverships and the receivership here, citing Clark v. Delaware, 269 A.2d 59 (Del.1970). Those

---

1. Intervenor Moody urges upon this Court Stuart v. United States, 416 F.2d 459 (5th Cir. 1969), a taxpayer-accountant case and claims its applicability here. In *Stuart*, the United States Court of Appeals for the Fifth Circuit allowed the taxpayer to claim her Fifth Amendment privilege although her records were in the hands of her accountant. The *Couch* decision may have *sub silentio* overruled *Stuart*. Couch v. United States, supra. (Brennan, J., concurring). Assuming the continued viability of *Stuart*, it is distinguished from this case by its facts. The critical fact there was that the taxpayer had delivered the records to the accountant *solely* for the convenience of the Revenue Agent conducting the audit. As is clear from reading the opinion, the Court there declined to allow this act of good will toward the IRS to strip the taxpayer of her constitutional privilege. This very significant feature has been unique to the *Stuart* case, and the *Stuart* result has not recurred. See, United States v. Mercurio, 418 F.2d 1213 (5th Cir. 1969), aff'd sub. nom. Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). The transfer of Moody's records to the Receiver in this case was independent of any IRS investigation. Thus Stuart v. United States does not apply here.

differences do not appear relevant to the issues here. The distinctions made in *Clark,* supra, were expressly rejected in Dier v. Banton, supra, and must be rejected here.

The theory of the bankruptcy cases is that the individual has commercial obligations to society. When his actions result in a court-ordered transfer, he has put himself in the position where he must surrender his papers to satisfy these obligations. In this sense he has acted voluntarily to bring about the transfer. United States v. Hoyt, 53 F. 2d 881, 885 (S.D.N.Y.1931).

 That theory is clearly appropriate here. As a banker operating with the trust and confidence of the community, Moody has the highest fiduciary and financial obligations to society. When, as here, he fails to justify that trust and confidence, and when his actions endanger his Bank's ability to satisfy his financial obligations, a receivership may be necessary in the public interest. In this case the receivership was ordered for the same reasons that a bankruptcy receivership is ordered, namely, protection of depositor accounts and protection of the Bank, a public institution (even though it be a proprietorship). Moody must be held to have voluntarily and without compulsion transferred his assets to Receiver. This Court thus concludes that Couch v. United States governs the instant case.

 It is well settled law that the privilege must be invoked before the private papers or records are transferred to a third party, or it is lost. E. g., United States v. Hoyt, supra. Accordingly, the privilege was timely asserted only as to the contents of the two locked boxes. Any of the requested records which are in those boxes are immune from Internal Revenue discovery. All of the remaining records were transferred to Receiver without objection and must be produced pursuant to the summons.

3. In addition and alternatively, the position is posed that by allowing unimpeded inspection of Bank records by the SEC, Moody waived his right to invoke the Fifth Amendment privilege and cannot now assert it as to the records reproduced by the SEC. In response to this, the Intervenor claims that no waiver occurred. Moody asserts as defects that the subpoena was not served on him personally; and, that access to the records was provided by a subordinate, not by Moody personally. Moody urges that his August 3 letter allowing the investigation is ineffective to cure these defects.

Such contention is answered by the Court's Findings of Fact. Based on the evidence presented, the Court has found that the decision to allow full access to the records was made by Moody himself with full instruction as to the legal consequences. The openness with which Moody exposed the Bank records has been emphasized. The SEC demonstrated considerable concern that Moody have full legal assistance. The extent of the examination and potential criminal sanctions were spelled out to Moody's lawyer and to his agents before compliance was demanded. The Court has found that Mr. Bridges was present and representing Moody when the Bank records were opened to the SEC but failed to interpose any objection. The fact that Moody was not served personally with the SEC subpoena, Harrison v. Prather, 404 F.2d 267 (5th Cir. 1968), is not germane here. The important point is that Moody himself knew of the factual and legal consequences of the investigation but failed to make objection. Technical errors by the SEC, if any, cannot mask the effect of Moody's acts and should not prejudice the IRS here.

 Although Bridges, as Moody's attorney, stated that all rights were reserved and not waived, such statements are inconsistent with the action taken. A blanket claim of a right is seldom effective. See United States v. Finley, 434 F.2d 596 (5th Cir. 1970). The completeness with which the subpoena was complied belies any reservation of Fifth Amendment rights. The Court has found that Moody opened his Bank

records without objection, allowing full inspection and reproduction by the SEC. He thereby waived his Fifth Amendment privilege as to those documents which were reproduced.

Although waiver of the privilege against self-incrimination during one official investigation does not normally bar its assertion during a later investigation, here the waiver extended to the allowance of extensive document copying during the investigation. The record reflects that the IRS has been furnished some, and is free to view the results of all of such copying, from the microfilm records of the SEC. For the Court to refuse access to the originals would be illogical and irrational. Therefore, the Court concludes that Moody irrevocably waived his Fifth Amendment privilege as to those documents copied by the SEC and that independently of Conclusion of Law # 2, the Receiver must produce those of the requested records which were copied by the SEC in its investigation.

■■■ 4. Because the correctness of Moody's returns is still at issue, the criminal nature of the investigation projected to be done by Culver does not bar production.

The applicable statute, 26 U.S.C. § 7602 under which the IRS proceeds provides as follows:

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability.

Moody contends that because of the predominantly criminal overtones, the projected Culver investigation is barred for lack of a "valid and proper purpose." United States v. Roundtree, 420 F.2d 845 (5th Cir. 1969). In 1963, the Supreme Court, in dictum, approved the judicial gloss engrafted by circuit courts to the effect that a taxpayer can successfully

resist the summons where "the material is sought for the improper purpose of obtaining evidence for use in a criminal prosecution." Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1963), citing Boren v. Tucker, 239 F.2d 767 (9th Cir. 1956).

Subsequent circuit court cases differed in interpretation of this dictum. The Fifth Circuit has indicated that the summons would not be enforced if the investigation were *predominantly* criminal in nature. Venn v. United States, 400 F.2d 207 (5th Cir. 1968). Other circuit courts have enforced summonses in principally criminal investigations so long as the correctness of a return (a civil question) was still at issue. E. g., United States v. Couch, supra. Perhaps significantly, all the reported cases which have come to the Court's attention have enforced the summons. E. g., United States v. Hayes, 408 F.2d 932 (7th Cir. 1969).

In 1971 the Supreme Court, in Donaldson v. United States, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), dealt with the varying interpretations of *Reisman*. The Court held that ". . . only where the sole object of the investigation is to gather data for criminal prosecution," is the petition to enforce the summons to be refused. The decision implied that this is true only when a criminal prosecution has begun. Until that time, it is impossible to negate the possibility of a civil assessment for back taxes. See United States v. DeGrosa, 405 F.2d 926 (3rd Cir.), cert. den., 394 U.S. 973, 89 S.Ct. 1465, 22 L.Ed.2d 753 (1969). Thus, unless a recommendation to prosecute has been made, the investigation retains a sufficient civil purpose, and use of § 7602 is proper. See United States v. White, 326 F.Supp. 459 (S.D. Tex.1971) (Bue, J.); and Couch v. United States, supra, 409 U.S. at 326, n. 8, 93 S.Ct. 611.

Viewed in this light, Moody's objection that the investigation is for an improper purpose must be denied. Although Special Agent Culver's work will be criminal in orientation, the civil as-

pects of Moody's case are still present because Revenue Agent Coyle's work which will proceed concurrently is not complete. So long as both an auditor and a special agent are working on the case, it retains the requisite civil element. The summons was not issued for an improper purpose and must be enforced.

5. The summons is reasonably specific and narrow in naming the requested records. The records sought are all reasonably necessary to a full and complete investigation by the Internal Revenue Service. The request for the records was not made for harassment purposes.

Intervenor Moody claims the IRS has access to many of the documents because copies of them are in the SEC files and among the Revenue Agent's papers. Therefore, Moody claims the IRS does not need the original documents. Moody also contends, citing Jones v. Securities & Exchange Commission, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015 (1936) and other cases, that the subpoena is unreasonably broad. Moody concludes that the summons constitutes harassment and that enforcement must be refused.

In substance, these objections claim an unreasonable search in violation of the Fourth Amendment. The contentions are without merit.

 No rule of law bars an IRS summons simply because copies of the records *may* be in another agency's files. The other agency, involved in an inquiry of its own, may omit reproduction of documents essential to a tax investigation.

The need for effective enforcement of tax laws justifies clothing the Service with considerable discretion in conducting its investigations. See United States v. Powell, supra. Thus, during the present investigation, the Special Agent may review documents which the Revenue Agent has already examined. United States v. Crespo, 281 F.Supp. 928 (D.Md.1968); compare United States v. Pritchard, 438 F.2d 969 (5th Cir. 1971).

The summons is not overbroad. See United States v. Giordano, 419 F.2d 564 (8th Cir.), cert. den., 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970). It is considerably narrower and more explicit than the subpoenas involved in cases cited by Moody. E. g., Jones v. Securities & Exchange Commission, supra. The Court has found as a fact that Moody has not been harassed by the IRS. See, United States v. Hayes, supra.

For the foregoing reasons, the Court concludes that enforcement of the summons will not violate Intervenor's Fourth Amendment rights.

The foregoing constitutes the Court's findings of fact and conclusions of law.