SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

W. L. MOODY & CO., et al.,
Defendants.

Civ. A. No. 72–G–167.

United States District Court,
S. D. Texas,
Galveston Division.

Sept. 4, 1973.

James E. Sims, Houston, Tex., for S. E.C.

V. W. McLeod, of McLeod, Alexander, Powel & Apffel, Galveston, Tex., for defendants.

Charles Sapp, of Liddell, Sapp, Zivley & Brown, Houston, Tex., for receiver.

Frank V. Ghiselli, Jr., of Pinedo & Hill, Houston, Tex., for intervenors.

## MEMORANDUM AND ORDER

NOEL, District Judge.

At a hearing on June 15, 1973, the Court granted Frank Pinedo, Esq. and Jerry G. Hill, Esq., doing business as Pinedo and Hill, leave to intervene. Fed.R.Civ.P. 24. Intervenors initially represented defendant Shearn Moody, Jr. (hereinafter Moody), individually and doing business as W. L. Moody & Co., Bankers (Unincorporated) (hereinafter the Bank) in this case.[1] Intervenors claim unpaid legal fees totaling $12,471.83 for services rendered. Intervenors claim and seek to enforce a possessory lien against the assets of Moody here in receivership.

At the hearing, intervenors presented the testimony of Jerry G. Hill, Esq., and one exhibit, consisting of time records and an affidavit. Pursuant to the Court's direction, intervenors thereafter filed their complaint.

In contesting intervenors' claim, Moody presented only the testimony of Henry Dalehite, Esq. who was present during part of the meeting at which Moody employed Pinedo and Hill and who testified concerning the terms of the employment. Defendant Shearn Moody, Jr., testified at the hearing but not with respect to intervenor's claim. Neither Dalehite nor Moody suggested that the fees sought by intervenors were unreasonable. Moody did not file an answer to intervenors' complaint.

The Court has heard all the evidence, arguments of counsel and studied the complaint. This separate memorandum opinion directed to the single claim is being entered because there is no just reason to delay its adjudication while essentially unrelated matters are being studied by the Court. Fed.R.Civ.P. 55(b).

### Findings of Fact

1. On August 10, 1972, Frank Pinedo conferred by telephone with V. W. McLeod, Esq. and Henry Dalehite, Esq., two Galveston attorneys, concerning possible representation of Moody in matters arising out of the investigation of the Bank by the SEC. The employment of Pinedo and Hill, well known specialists in securities law and SEC matters, had been recommended to Moody by his regularly employed counsel McLeod. McLeod and Dalehite are not members of the same law firm, but both represented Moody in connection with the employment of intervenors.

2. On August 11, Pinedo and Hill traveled to Galveston and met with Moody at the Bank. Also present were McLeod, Dalehite, Tom Blair, Esq. and bank officers. The meeting began at 11:00 a. m. and lasted most of the afternoon. McLeod and Dalehite were not present for the entire meeting.

3. The meeting resulted in an agreement between Moody and intervenors whereby the latter were to represent Moody during the private investigation being conducted by the SEC. Payment was made of $30,000.00 to intervenors as a retainer. Intervenors' time was to be charged against the retainer at a rate of $60.00 per hour plus expenses. If the retainer was exhausted from such charges before conclusion of the SEC investigation, a renegotiation of the fee was to take place. If events transpired which changed the nature of the investigation [meaning imminence of a suit to be filed by the SEC], the fee was to be renegotiated upward. The amount of this increase was not agreed upon. According to Moody's testimony, McLeod was to supervise intervenors' work.

4. On August 28, Moody, accompanied by Hill and his associate, Frank V. Ghiselli, Jr., Esq., traveled to Fort Worth, Texas to testify before the SEC. They returned to the Houston area late that night.

5. After the events in Fort Worth, and based on his past experience with

1. While Moody and the Bank are sometimes referred to as if they were separate entities, that is inaccurate; the Bank is a proprietorship and Moody is the sole proprietor.

the SEC, Hill concluded that additional SEC action, possibly a law suit, would soon be forthcoming. He so informed Moody on August 29. Moody requested that Hill represent him during any further involvement with the SEC and offered to pay a $75,000.00 fee for such representation. Hill agreed to so represent Moody but indicated that the nature of the work, and hence the hourly fee, could not be determined at that time.

6. As predicted by Hill, James Sims, Esq., of the SEC contacted Hill later in the day on August 29 and informed him of the SEC's intention to file suit. As has been described in United States v. Buck, 356 F.Supp. 370 at 374 (S.D.Tex. 1972), a meeting was held on August 30,[2] with the Court in Chambers, attended by Moody, Hill, and Sims. Thereafter, Moody and Hill continued negotiating with businessmen in an effort to liquidate a sufficient amount of Moody's assets (all of which were encumbered) to pay off the Bank depositors in the event filing the SEC suit caused a run on the Bank. Moody and Hill were also conducting intensive legal negotiations with Sims over the contents of the complaint and a proposed consent decree.

7. On September 6, the SEC filed this suit. Hill was named attorney of record for Moody and the Bank, since the SEC purported to sue them separately. Hill continued to represent the named defendants pursuant to the employment agreement until September 19.

8. On September 19, a stipulation was filed substituting McLeod for Hill. On September 20, the Court approved the stipulation and, upon receipt of Hill's accounting, released him as an attorney in the case.

9. From August 10 to September 20, the law firm of Pinedo and Hill expended 591 hours representing Moody under their employment agreement. Of this total, 210 hours occurred before August 30, the day of the first meeting with the Court. From August 30 to September 20, Hill devoted 220 hours to Moody's representation, and other lawyers of the firm devoted 160 hours of time to the representation.

10. Intervenors compute the charge for the initial 270-hour period at $60.00 per hour, a total of $12,600.00. The 220 hours spent by Jerry G. Hill after August 29 is charged at $90.00 per hour, a total of $19,800.00. The 161 hours devoted by other lawyers after August 29 is computed at $60.00 per hour, a total of $9,600.00. Intervenors claim a total of $42,060.00 in legal fees, of which $30,000.00 (the retainer) was paid by Moody on August 11. In addition, intervenors claim $345.91 in expenses, making a total unpaid balance of $12,405.91. Intervenors also claim interest on this amount dating from January 1, 1973. Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (1971). Moody claims that he does not owe intervenors anything.

### Conclusions of Law

1. The Court, having jurisdiction over the receivership estate, likewise has jurisdiction over intervenors' claim. 3B Moore's Federal Practice § 24.18 [2]. The rights of any creditor to the estate may be federally adjudicated as ancillary to the main proceeding. Taylor v. Producers Pipe & Supply Co., 114 F.2d 785 (10th Cir. 1940).

2. On August 11, Moody and intervenors entered into a valid oral contract for legal services. 7 Tex.Jur.2d, Attorneys at Law § 64 (1959). The prospective legal representation was limited to the SEC private investigation of Moody and the Bank, and limited to an expenditure of $30,000.00 in fees and expenses. Pursuant to this contract, intervenors provided defendants 270 hours of legal services and became entitled to $12,600.00 in fees plus expenses.

3. On August 30, defendant Moody and intervenors entered into a second contract for additional legal services.

---

2. The Court in United States v. Buck, supra, incorrectly stated that the meeting ooccurred on August 29.

This representation was to involve the federal litigation expected to be precipitated by an SEC complaint (this lawsuit). The rate of compensation was not determined but both parties anticipated a rate in excess of $60.00 per hour.

■ 4. Contracts between attorney and client negotiated subsequent to the establishment of an attorney-client relationship are viewed with suspicion. 10 Williston on Contracts § 1285, at 919 (Jaeger ed. 1967). Because the attorney has a strong bargaining position, such contracts are closely scrutinized for unfairness and overreaching. L. Waterbury & Co. v. City of Laredo, 60 Tex. 519 (1883). Nonetheless, for several reasons the Court concludes that the August 30 agreement was made upon the recommendation and with the advice of regular counsel, absent even a scintilla of evidence of coercion or undue influence. No coercion or undue influence was claimed by Moody in any capacity.

5. The possible need for renegotiating the original contract was contemplated and provided for in the original employment agreement of August 11. At that time, and thereafter, Moody was also represented by other attorneys, including McLeod and Dalehite. Moody was and is an experienced businessman and litigant, fully acquainted with the employment of counsel, the range of costs of legal services, and fully capable of assessing his need for such services. Finally, as recognized by all parties, representation during litigation is different in nature and more difficult than representation during an investigation leading up to litigation. The August 30 agreement constituted a separate contract for representation in the litigation; it was not a renegotiation of the original contract. Moody is bound by his original, as well as his later or August 30, agreement. L. Waterbury & Co. v. City of Laredo, supra; Cooley v. Buie, 291 S.W. 876 (Tex.Comm'n App. 1927, holding approved).

■ 6. Where, as here, the parties did not agree upon the compensation to be paid the attorney, or the manner of calculating it, the attorney is entitled to be paid the reasonable value of his services. Ward v. Armistead, 17 Tex.Civ. App. 374, 43 S.W. 63 (1897); 10 Williston on Contracts § 1285A, at 936 (Jaeger ed. 1967).

Defendant Moody does not dispute the hours worked by intervenors or the value of such services based upon the usual criteria for valuing such services, which are well established by the jurisprudence. Moody only contends that the fee sought for the work is unreasonable.

■ Several factors may be considered in determining the reasonableness of attorneys fees. The nature of the services, the complexity of the legal questions, American Exchange Life Ins. Co. v. Willis, 433 S.W.2d 945 (Tex.Civ. App.—Tyler 1968, no writ), and the amount involved in the litigation, Vaughn v. Gunter, 458 S.W.2d 523 (Tex.Civ.App.—Dallas 1970, writ ref'd n. r. e.), are relevant factors for consideration. Other factors may and should be considered. Braswell v. Braswell, 476 S.W.2d 444 (Tex.Civ.App.—Waco 1972, no writ). Because intervenors' original fee arrangement and intervenors' present claim are both computed by intervenors on an hourly basis, the appropriate criteria must be melded into a determination of the reasonable hourly charge for intervenors' services.

The Court takes judicial notice of the fact that federal securities litigation is unusually complicated, both as to the relevant facts and as to the applicable law. Representation of Moody's interests was unusually complex, involving both legal and business advice. The SEC complaint embodied fundamental but difficult legal issues.

Hill, Sims and the Court all were of the unanimous opinion that filing the SEC complaint would result in a run on the Bank by depositors. Hill was of the view that Moody's liquid assets were in-

sufficient to satisfy all depositors in the event of a run on the Bank and that, under the law, failure to do so would subject Moody to additional civil and criminal liabilities. Hill therefore advised Moody to immediately liquidate his personal assets, in anticipation of an expected demand by depositors for payment. Much of Hill's time was spent actively assisting Moody in his unsuccessful attempt to so arrange his business affairs.

7. In retrospect, the task of liquidating Moody's assets before filing of the SEC suit was an impossible one. The accounting made after the Bank was closed on September 6 provides insight into Moody's precarious financial condition during the period of intervenors' representation. At the close of business on September 6, the Bank had $26.7 million in total deposits. $18.4 million of such deposits belonged to local governmental bodies. These deposits were secured by various federal governmental securities, the face amount of which was $18.6 million. These securities, however, were not readily negotiable at a favorable price because of their unusual nature and the dollar values involved.

Moody and his family maintained substantial deposits in the Bank for business and personal use. The non-governmental deposits which did not belong to the family totaled $5.4 million on September 6. At that time only $2.2 million was available in cash to cover any and all deposits. The loan portfolio totaled $2.9 million but, as described in the testimony, it was poorly documented, undercollateralized, and actually worth much less.

As the above figures demonstrate, even if it is assumed that the Moody family would not receive their deposits, cash on hand in the Bank was woefully insufficient to pay the other depositors. In the words of the Temporary Receiver, ". . . the Bank was bankrupt or in imminent danger of bankruptcy." (Final Report, filed December 13, 1972, p. 9). A further complication was the fact that the assets which were available could not readily be converted into cash.

Moody had considerable personal assets in addition to those carried on his books as assets of his sole proprietorship, the Bank; but, as the Receiver testified, these other assets were encumbered in various ways and could not readily be liquidated.

8. In addition to the complexity and difficulty of the work undertaken by intervenors, the amounts of money and property involved were obviously substantial. Finally, during their representation of Moody, intervenors gave their highest priority to his work and thereby bypassed other work. Hill spent virtually all of his time on the matter. The other three lawyers devoted several days to the case.

Based upon its experience at the bar and its observation from the bench, and the observation of Hill's representation of Moody, the Court finds that intervenors faithfully represented defendants from August 30 to September 20 in matters vital to the preservation of Moody's assets. In this delicate matter of great importance to Moody, intervenors, and especially Hill, demonstrated a high degree of professional competence and dedication and gave Moody effective representation.

9. Hill testified that intervenors' claim was not only reasonable but conservative. The Court agrees. Although more testimony might have been helpful, in the matter of attorneys fees the Court itself is considered an expert. Campbell v. Green, 112 F.2d 143, 144 (5th Cir. 1940); First National Bank of Fort Worth v. United States, 301 F. Supp. 667 (N.D.Tex.1969).

Based upon all relevant facts, the court finds that $90.00 per hour for Hill's work and $60.00 per hour for the other lawyers' work here claimed, are reasonable hourly charges. Therefore, in addition to the $12,600.00 earned prior to August 30, intervenors are entitled to $19,800.00 and $9,600.00 for the work by Hill and the other lawyers re-

spectively from August 30 to September 20. Intervenors are also entitled to their out-of-pocket costs of $345.91. However, intervenors' claim for interest on the fee from January 1, 1973 will be denied. From this total figure to which intervenors are entitled must be subtracted $30,000.00 already paid by Moody as the retainer.

Now, therefore, it is ordered, adjudged and decreed that intervenors Frank Pinedo and Jerry G. Hill, doing business as Pinedo and Hill, shall recover from the receivership assets, attorneys fees and expenses in the total amount of $12,405.91.

It is further ordered, adjudged and decreed that E. O. Buck, Temporary Receiver forthwith pay over to intervenors the sum of $12,405.91 from the funds in his possession as Temporary Receiver.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52. To the extent that any finding of fact is deemed to be a conclusion of law, it is adopted as such; to the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such.