**SECURITIES & EXCHANGE COMMISSION, Plaintiff,**

**v.**

**W. L. MOODY & CO., BANKERS (UNINCORPORATED), and Shearn Moody, Jr., Defendants.**

**Civ. A. No. 72–G–167.**

United States District Court,
S. D. Texas,
Galveston Division.

Memorandum and Order
filed Jan. 15, 1974.

Supplemental Memorandum (with supporting orders) filed March 25, 1974.

466

See also D.C., 363 F.Supp. 481.

James E. Sims, Houston, Tex., for Securities & Exchange Commission.

V. W. McLeod, McLeod, Alexander, Powel & Apffel, Galveston, Tex., for defendants.

Charles Sapp, Liddell, Sapp, Zivley & Brown, Houston, Tex., for receiver.

## MEMORANDUM AND ORDER

NOEL, District Judge.

### I. Preface

On the evening of September 6, 1972, the Securities and Exchange Commission (hereinafter called SEC) initiated this lawsuit. Named as defendants were W. L. Moody & Co., Bankers (Unincorporated) (hereinafter called Bank) and Shearn Moody, Jr. (hereinafter called Moody).[1] Simultaneously, the Court entered a Final Judgment (hereinafter called Consent Decree), which had been agreed to by all parties. It enjoined defendants from committing future violations of the federal securities laws. At the request of the SEC and without objection by Moody, the Court also entered its Order Appointing Temporary Receiver which directed the Temporary Receiver to "take charge of all of defendant W. L. Moody & Co., Bankers (Unincorporated)'s assets and property, tangible or intangible, wherever located."

On September 7, 1972, the Court appointed E. O. Buck Temporary Receiver (hereinafter called Receiver). Concurrently, it named Charles Sapp, Esq. (hereinafter called Sapp), the senior partner in the firm of Liddell, Sapp, Zivley and Brown, as attorney for Receiver.

Receiver's immediate task was to marshal and liquidate Bank's assets to the extent necessary in order to pay its de-

---

1. Although named as a separate defendant, the Bank is a sole proprietorship owned by Moody. As such it is not a separate legal entity. It is one of several business enterprises owned or effectively controlled by Moody.

positors. On October 5, 1972, Receiver began paying government depositors. On November 3, he began paying certain other depositors.

On December 4, 1972, defendant moved for termination of the receivership. On December 13, Receiver filed his Final Report, Accounting and Application which summarized the chronology of the receivership, detailed the status of deposits and assets, sought termination of the receivership and requested fees and expenses for Receiver and his attorney. On December 19, 1972 the Court began trial of all issues then pending. After substantial testimony had been received, the hearing was continued to await the personal appearance and testimony of defendant Moody. His attorney in charge, V. W. McLeod, Esq. reported that Moody was ill and under treatment in Durham, North Carolina.

On May 15, 1973, Receiver filed a Supplement to the Final Report, reciting more recent events, updating accounting, and requesting an increase in the fees.

After several continuances resulting from defendant's failure to appear, trial resumed on May 21, 1973. Moody appeared and testified. Trial was concluded June 18, 1973. The parties submitted memorandum briefs on all issues. All pending matters are now ready for final disposition.

## II.   Review of the Receivership

### A.   Events Preceding Appointment of Receiver.

On July 13, 1972 the SEC commenced review of Bank's records in a non-public investigation. Rule 5, Relating to Investigations, 17 C.F.R. § 203.5 (April, 1973). Moody had been formally notified and consented to the review. He directed bank personnel to cooperate. United States v. Buck, 356 F.Supp. 370 (S.D.Tex.1973), aff'd 479 F.2d 1327 (5th Cir. 1973), cert. denied, 414 U.S. 1097, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973). Consistent with general Commission policy as reflected in Rule 5, no notice or information about the investigation was made public.[2]

From its investigation, the SEC determined that unregistered dealers were selling unregistered securities and that material misrepresentations were made in connection with such sales. The SEC found that such actions violated the Securities Exchange Act of 1933, as amended, 15 U.S.C. 77a et seq., and the Securities Exchange Act of 1934, as amended, 15 U.S.C. 78aa et seq. To prevent future violations, the SEC decided to file this action. Moody's counsel was so informed on August 29, 1972.

At the request of James E. Sims, Esq., the SEC attorney in charge, the Court received Sims, Moody, Moody's attorney, Jerry G. Hill, Esq. (hereinafter called Hill), and Hill's associate, Frank Ghiselli, Jr., Esq.,[3] in Houston chambers on August 30.[4] Sims informed the Court of the serious charges contained in the proposed complaint.[5] Sims expressed his belief that the publicity which would ensue from merely filing the complaint would lead to a bankrupting run on the Bank, with resulting losses to Moody and depositors. On behalf of Moody, Hill concurred, but also ex-

---

2. Premature publicity could have produced a run on the Bank by depositors.

3. Although not listed as an attorney of record until September 20, V. W. McLeod was also counseling and advising Moody at that time. Moody testified that McLeod supervised Hill's representation of Moody's interests. .

4. The August 29 date mentioned in United States v. Buck, 356 F.Supp. 370 at 374 (S. D.Tex.1973) is incorrect.

5. Plaintiff SEC filed proposed findings of fact detailing the unreported meetings and other events occurring prior to the filing of suit. The findings were amended after a pretrial conference with Hill, the attorney who represented Moody at that time. As amended, the findings of fact which are quite lengthy comport with the Court's recollection of the events. They are hereby adopted as the complete findings of fact, insofar as they relate to the particular subject matter but will be referred to herein in summary. Fed.R.Civ.P. 52.

pressed his fear that class actions might be brought against Moody by aggrieved depositors.[6]

Because of these possible consequences and to protect depositors, the SEC advised the Court of its intention to request a receivership for the Bank assets. In response, Hill declared that negotiations were then in progress to liquidate sufficient of Moody's assets to satisfy possible depositor demands. He described these negotiations and urged that additional time be allowed to consummate them.

Based on Hill's representations, the Court urged the SEC to forbear from filing suit for a sufficient period to allow Moody's negotiations to bear fruit. The SEC agreed to refrain until September 5, 1972. Sims indicated that if satisfactory arrangements were made to insure payment to all depositors, the SEC would not seek a receivership.

During succeeding days, counsel apprised each other and the Court of developments. Hill's negotiations were unsuccessful. Sims and Hill conferred over the contents of the complaint which the SEC proposed to file, a proposed consent decree, and a proposed order appointing a receiver. It was contemplated that the consent decree would enjoin Moody from further violation of securities law; that the receivership would embrace Bank assets only; and, that the receiver would pay Bank depositors with funds generated from Bank Assets.

The Court, Moody, and the attorneys met again on September 6, 1972 in Houston chambers. At that point, the SEC had ordered Sims to file suit immediately. At the Court's behest, Sims sought further postponement but the Commission stood firm. The Court suggested meeting the following day in Galveston, but Sims had been instructed to file the complaint immediately. Hill stated he would advise Moody to consent to entry of a permanent injunction, and neither object nor consent to entry of

the order appointing a receiver. The conference was recessed and all proceeded to Galveston.

At about 8:00 p. m. the conference resumed in Galveston chambers. The Court expressed its decision to grant the receivership. Thereafter, in open session and being fully apprised in the premises, the Court received the Complaint and ordered it filed, entered the Final Judgment, and signed a separate Order Appointing Temporary Receiver.

Moody was present at each conference, and in open court on September 6. He willingly and knowingly consented to entry of the Final Judgment and refrained from objecting to appointment of the temporary receiver. Moody's economic situation and legal posture which were clearly understood and appreciated by Moody and his attorneys, mandated their decision.

The record discloses that Moody made a written statement to the press in October, 1972. This out of court statement, as well as certain testimony given in May, 1973 suggest that Moody's consent to the Final Judgment and acquiescence to the receivership may not have been voluntary. However, the Court finds that such statements are totally contradicted and refuted by earlier statements made by Moody and his attorney in August and September, 1972. These earlier statements, made before the Court signed the consent decree and appointed the Receiver and when the shelter of the Court was needed by him, demonstrate that Moody with complete understanding approved and agreed to the Court's actions of September 6. These earlier statements were made while the receivership was being contemplated and upon advice of Hill and Moody's present counsel, McLeod. The August and September statements are more representative of Moody's true intention and state of mind at that time, than his later pronouncements, made after a disastrous

---

6. Because of the Bank's proprietary status, Moody was personally liable for damage to depositors caused by loss of funds or delay in payment.

run on the Bank and feared class action suits had been averted.

The SEC did not act in an unseemly manner. The SEC could have filed its complaint on August 29 or before, without first disclosing its intentions to Moody or the Court. Instead, the SEC informed Moody and apprised the Court of its impending action, following which the SEC acquiesced to the suggestion of a short postponement. After that postponement, the SEC concluded it could not countenance continued operation of the Bank in which it found to be serious violations of federal law.

At trial on December 19, 1972, defendant's counsel indicated general satisfaction with the Receiver's Final Report. He limited defendant's objections to three items, namely, the fees suggested for Receiver and for his attorney, and the fee claimed by Moody's former attorney Hill.[7] On May 21, 1973, Moody testified he was satisfied Receiver fully and faithfully performed his duties and that except for the fees, he had no complaint. The Court has heretofore approved Hill's claim and ordered it paid.[8]

Receiver's Final Report filed December 13, 1972, suggested $200,000.00 as a reasonable fee for Receiver's attorney, and $150,000.00 as Receiver's fee. The first Supplement, filed May 15, 1973 after termination of the receivership was delayed, requested additional fees of $65,000.00 for Receiver's attorney and $25,000.00 for Receiver. Moody contends total compensation of $60,000.00 for Receiver's attorney and $25,000.00 for Receiver are fully sufficient.

Defendant's testimony indicating approval of Receiver's performance of his duties would appear to reduce the Court's task. Nevertheless, as a predicate to assessment of the work of Receiver and his attorney and a determination of their compensation, the history of the receivership must be reviewed.

**B. Initial Problems for Receiver.**

Through conferences with the parties, the Court had become keenly aware of the Bank's legally complex and financially precarious condition. The Court appreciated the absolute necessity for an experienced and able receiver and an equally qualified attorney for the receiver. A survey of qualified residents of Galveston disclosed interrelationships with Moody which precluded their appointment either as receiver or attorney. Consequently, Receiver and his attorney were selected from the larger group of equally qualified residents of Houston.

E. O. Buck, a resident of Sugarland, Texas, was employed for 21 years by Texas Commerce Bank and its predecessors, one of Houston's largest banks. He retired in 1969 as Vice Chairman of the Board of Directors and Chairman of the Trust Investment Committee. Through such experience, Buck became thoroughly familiar with the operation of banks and their interaction with other financial institutions. Additionally, he achieved exceptional stature in the banking community. Charles Sapp, Esq. and his law firm, Liddell, Sapp, Zivley and Brown, brought to the task well known expertise in handling legal matters in the financial field, developed through the representation of a number of banks and financial institutions over a long period of time.

Before appointing Receiver and his attorney, the Court carefully apprised each of the difficult and extensive task ahead. Expeditious payment to depositors was emphasized as of paramount importance. Also stressed was conservation of the residual assets for eventual return to Moody. Although closing the Bank had prevented any run by deposi-

---

7. Hill and the firm, Pinedo and Hill, represented Moody during initial stages of this cause. They claim Moody did not pay a portion of their legal fees. The Court allowed them to intervene in this cause to assert the claim.

8. SEC v. W. L. Moody & Co., Bankers (Unincorporated), 363 F.Supp. 481 (S.D.Tex. 1973), reconsideration denied, December 3, 1973.

tors, the Court realized an expeditious return of deposits should avert the class action litigation feared by Moody's attorneys. The Court was also very concerned over possible loss of public confidence in the banking industry.

It was well understood that the receivership would be a full-time responsibility for Receiver and his attorney for an indefinite period of time. Before their appointment, the Court obtained the commitment of each to give this matter first priority. The Court also obtained Sapp's commitment to provide the assistance of other lawyers in his firm when needed, on a priority basis.

The receivership did in fact demand the fullest measure of the time and talents of both Receiver and his attorney. Although Receiver was well versed in banking and his attorney in banking law, neither was familiar with the affairs of Moody or the Bank. A preliminary survey of the Bank operation revealed a multitude of problems requiring immediate attention.[9]

In addition, because the Bank was a sole proprietorship, Receiver and his attorney had to familiarize themselves with the practical problems and legal character of this rare kind of bank. Soon after institution of the receivership, Moody's attorney reported that Moody was gravely ill with hypertension. This created a less than satisfactory situation since Receiver was forced to work exclusively with Moody's representatives rather than with Moody himself.

Receiver was immediately confronted with an emergency request for payment of certain deposits from the City of Galveston, the County of Galveston, and Galveston County Navigation District No. 1 (hereinafter called government depositors). Each maintained short-term, interest-bearing time deposits in the Bank. These totaled $18,400,000 on September 6, 1972.

Upon arrival in Galveston on September 7, Receiver met with representatives of the government depositors, who explained their problem. These deposits represented substantially all of their available funds. They were without funds to meet their payrolls aggregating $1,300,000, due the following day.

The government deposits were secured by federal Farmers' Home Administration Insured Notes (hereinafter FHA's) and United States Treasury bills. As secured creditors, these depositors were entitled to priority in payment. Although $248,845 in cash was on hand in the Bank, and $1,855,135 was due the Bank from correspondent banks, only $622,832 was due from Galveston County banks. Therefore, the Bank's immediately available funds, if paid to the government depositors, would have been insufficient to meet the payrolls.

Receiver concluded that he could not obtain the necessary funds by the following day, September 7. He so advised the officials and suggested they borrow the necessary funds short term, from another institution. At the same time, he promised promptly to obtain funds with which to pay off the government depositors in full. It was expected that the short term loans would be repaid from such funds.

Receiver immediately contacted personal acquaintances in the Bank's correspondents by telephone. He explained the situation and asked each to transfer the Bank's funds to him immediately. This was done. From these funds, Receiver was able to disburse a portion of the government deposits on September 13, 1972.

Because of his personal prestige and prior experience with the correspondent banks, Receiver was spared the formali-

9. In this regard Receiver (1) surveyed the necessary work to be done at the Bank and selected the employees to be retained, (2) reviewed security arrangements and took additional security precautions including personal retention of all keys to the Bank and the alarm system, (3) opened a checking account at another local bank and arranged transfer of moneys, and (4) determined the need for an audit and employed an accounting firm which began work on September 9.

ty of personally going to the correspondent banks and presenting his official credentials. The time gained was important during this hectic first week of the receivership, when numerous other problems were demanding Receiver's personal time and attention.

### C. Expansion of the Receivership.

The Order Appointing Temporary Receiver limited the receivership to those assets of defendant Moody related to the operation of the Bank. Because it was an unincorporated sole proprietorship, Moody was individually liable for all obligations of the Bank, even though his assets not attributable by him to the Bank were not initially included in the receivership. Receiver's prompt preliminary examination of the Bank's condition revealed that the assets then in receivership were grossly inadequate for payment of depositors. Receiver estimated an additional $3,000,000 to $4,000,000 was needed to pay all depositors *other than* Moody, his corporate entities, and his family (hereinafter called Moody related depositors).[10]

Faced with this significant deficit, Receiver applied to the Court on September 19, 1972 for expansion of the receivership to include *all* of Moody's assets, Bank as well as other. Plaintiff SEC joined in the motion. Moody opposed the inclusion of all his assets for the protection of his depositors as being unnecessary.

Because of the possibility of transfer, disposition or attachment of the additional assets, or a serious change in the condition of Moody's health which could affect his legal competence, the Court immediately enjoined any transfer, disposition, attachment or interference with any of his assets. A hearing on Receiver's motion was held September 19 and 20, 1972. The evidence presented clearly demonstrated that Bank assets would not generate sufficient cash to pay the depositors. The Court overruled the opposition of Moody and expanded the receivership to include all of Moody's assets, except certain personal property such as automobiles, jewelry and clothing. The Court deemed such action to be consistent with Moody's responsibility to depositors and for the protection of both Moody and the depositors.

### D. Payment of Local Government Depositors.

As secured depositors, the government depositors were entitled to prior payment in full of their deposits, including interest. The sale of FHA's and Treasury bills held to secure the government deposits, was expected to generate sufficient cash with which to make such payments. Receiver determined, however, that full payment to unsecured depositors might depend upon obtaining the highest possible obtainable price for the FHA's. Receiver sought to sell the FHA's accordingly.

Although Receiver was officially commended by one of the government depositors for arranging such prompt payment, at trial defendant criticized Receiver's sale of the FHA's and contended he could have obtained a better price. An extended discussion of Receiver's actions is thus appropriate.

After consultation in the local financial community, Receiver determined that the local market for the sale of all the FHA's was unsatisfactory. Local prices were generally lower than those available in the New York City market. A favorable sale at the going local price would have yielded a maximum profit of about $100,000. However, this profit was probably unattainable because the

---

10. Moody's demand deposit account totaled $969,770.89. The deposit account of W. L. Moody Bankers Trust Company, controlled by Moody, totaled $430,298.16. Empire State Life Insurance Company, also controlled by Moody, held certificates of deposit totaling $800,000.00 and had a demand deposit account of $63,604.48. Robert L. Moody, defendant's brother, had $356,070.01 in demand deposits. Mrs. Frances Moody Newman, Moody's mother, had $20,203.93 in demand deposits, and $154,389.78 in time deposits.

sheer volume of FHA's to be sold would inevitably have depressed the local market.

After careful consideration of the alternatives, Receiver arranged to offer the FHA's for sale in the New York market. To prevent disclosure of the forced nature of the sale, Receiver obtained the assistance of the Morgan Guaranty Bank of New York City, the largest dealer in governmental securities in the world. Its function was to negotiate the price. The assistance of First National City Bank was enlisted to accumulate and hold the FHA's during negotiations. The purpose was to provide immediate delivery and transfer when a satisfactory price had been negotiated. By September 20, 1972, all of the securities had reached First National City Bank. Thereafter, Receiver obtained a series of daily quotations from Morgan Guaranty. On September 26 and 27, Morgan Guaranty obtained offers at satisfactory prices which were accepted by Receiver. All sales were consummated September 28. The proceeds arrived in Galveston October 5 and Receiver paid depositors October 6, 1972.

Profit from the total transaction amounted to $533,770.46, almost $450,-000 more than was predicted from local sale of the FHA's. This profit was immediately available to pay other depositors and thereby inured to Moody's benefit as well. As a courtesy to Receiver because of his longstanding professional relationship with the New York banks, neither institution made any charge for its services. Receiver obtained the maximum profit available on the national market without the usually attendant expenses.

The arrangements negotiated by Receiver with the local government depositors for their payment further maximized the profit from the sale of the FHA's. The Bank had contracted to pay the government depositors higher interest rates than was available from other local institutions. After sale of the interest bearing FHA's, the interest charges payable to depositors would have been a burden on receivership assets. For the depositors, on the other hand, early termination of the contracts and of the premium interest rates would have resulted in lost interest.

Initially, the government depositors expressed their intention to press claims for lost interest against Moody individually. Receiver resisted these demands and won agreement from depositors, releasing Moody from any personal liability for such interest. Because Receiver was arranging prompt payment in full to government depositors, he was also able to negotiate an agreement with the government depositors to forego interest for the remainder of the contract period on each deposit.

Further in settlement, the government depositors agreed their interest on deposits would termimate on the date the FHA's were sold, although the proceeds from sale of the FHA's were not received until one week later.[11] As a result of this agreement, one week's interest on over $17,000,000 was saved, for the receivership and Moody.

Early sale of the FHA's profited the receivership and Moody in yet another manner. Short term interest rates affect the sale price of long term securities, including FHA's. Usually an increase in the prime interest rate adversely affects the sales price of long term securities. Receiver expected an increase in the prime interest rate which he believed would reduce the sales price of the FHA's. To avoid this possible loss of profit, Receiver pressed for an early sale. Receiver's judgment proved prescient; the prime rate increased the day following the sale. Delay in arranging the sale one more day would have reduced the FHA's sale price and the profit to the receivership and Moody significantly.

11. The Commissioners Court of Galveston County passed a resolution thanking Receiver for his cooperation and work.

The excellent results in selling the FHA's were achieved by Receiver despite counterproductive efforts by Moody's associates. Prior to offering the FHA's for sale, Receiver insisted news of a forced sale of FHA's would severely depress the market and reduce the sale price. Nonetheless, Moody's advisors urged taking bids on the securities. They next made indiscreet inquiries on the local market seeking a buyer. None was found. And finally, after Receiver obtained the acceptable offer through Morgan Guaranty which was limited in time, the advisors brought forth a letter. The letter purported to be an offer from a buyer located in Houston, to buy all the FHA's at a price 0.25 percent higher than the pending firm offer. The advisors demanded that Receiver accept what they apparently considered a bona fide, responsible offer contained in the letter.

The purported offeror was unknown to Receiver and inquiry failed to identify him. The Houston telephone book carried no listing under the name. The letter contained no information concerning the offeror's professional capacity or financial responsibility. Moody's advisors could supply no further details about the offeror or the offer than the bare bones purported offer contained in the letter. Taking time to establish the information, if in fact available, and to evaluate the offer as well as the capacity of the offeror, would have endangered the Morgan Guaranty offer. It must be borne in mind that the latter was for a limited time and could have been withdrawn.

Viewed charitably, these efforts constituted a naive intrusion on Receiver's responsibility. Viewed less charitably, the actions suggest a deliberate effort to obstruct and embarass Receiver in his performance of his duties. In either event, Receiver properly rejected the ad-

vice of Moody's associates. Defendant's criticism of Receiver's disposition of the FHA's is totally lacking in substance and, therefore, frivolous.

## E. Payment to Outside Depositors.

In addition to the local government deposits, the Bank held over 5,500 accounts totaling $8,227,779.20. Seven accounts totaling $2,794,337.25 were the personal and business accounts of Moody related depositors.[12] The remaining moneys, $5,433,441.95, were funds of individuals, families, organizations, and businesses other than Moody and his family (hereinafter called outside depositors.)

The cash available to pay all depositors other than government depositors, that is to pay Moody depositors and outside depositors, was $2,194,273.51. Because of this gap of $3,239,168.44 between the funds needed to pay outside depositors and the cash actually available, all parties contemplated that no attempt would be made by Receiver to pay the Moody depositors.[13] The unanimous opinion of all concerned was that outside depositors next should be paid in full.

Several considerations dictated prompt payment to outside depositors. The importance of this money to depositors was obvious. Receiver had received much mail detailing the hardships some depositors faced. Because none of the deposits were insured by the Federal Deposit Insurance Corporation or any other body, the depositors were genuinely concerned whether they would be paid at all. General public confidence in banks and the Court's ability to respond to the emergency were at issue. The prospect of claims being brought against Moody personally by aggrieved depositors, possibly in the form of a feared class action, increased the urgency. A final consider-

---

12. See fn. 10, supra.

13. The Order Appointing Temporary Receiver reflects this understanding, directing the Temporary Receiver to pay all accounts "belonging to persons or corporations who are not associates of W. L. Moody & Co.; Bank-

ers, Unincorporated or Shearn Moody, Jr., or controlled by such defendants either directly or indirectly whether through the ownership of voting securities, by contract or otherwise and all persons who are not of blood relationship to Shearn Moody, Jr."

ation was Moody's ill health, represented by his attorney to be critical.

Although all agreed that the outside depositors should be promptly paid in full, in out-of-court published statements which the Court has judicially noticed, made during October 1972 and testimony at trial, defendant and his advisors criticized the manner in which Receiver went about raising the additional cash necessary for payment of outside depositors in full. Therefore, what actually occurred will be reviewed.

A potential source of cash was the Bank's loan portfolio which could have been sold to the United States National Bank (hereinafter called U. S. National.) The Bank's Statement of Condition dated September 6, 1972 valued the portfolio at $2,900,000. Before institution of the receivership, Moody and Hill had attempted to raise cash by sale of the portfolio to U. S. National.

As a first step, Receiver carefully reviewed the legal status of the portfolio and then determined its cash value for sale purposes. He enlisted the assistance of two lawyers to review the documentation and collateral, if any, supporting each loan. The examination revealed serious deficiencies and irregularities in each category.[14]

Knowing of its prior interest, Receiver inquired of U. S. National as to its then interest in buying the loan portfolio. U. S. National was aware of suspected irregularities in the portfolio and demanded a prior examination of the loans by its employees, before making an offer. Receiver resisted this demand because he thought the examination would be a breach of confidence with borrowers and therefore not in Moody's best interest. As an alternative, Receiver obtained U. S. National's agreement to accept an independent evaluation of the portfolio by Clyde Shannon, a well known and highly respected former bank examiner and retired banker.[15] With the Court's approval, Receiver employed Shannon to examine and appraise the portfolio. Shannon examined the loans and found the reasonable value of the portfolio to be $1,050,000.00.[16]

One of Moody's assets in receivership was controlling stock interest in First State Bank of Hitchcock. Moody and his attorney Hill had attempted to sell this stock prior to September 6, 1972. U. S. National, with whom they had negotiated, remained interested in purchasing it. Therefore, Shannon next reviewed the financial condition of that bank for the purpose of determining the book value of its stock.

In early October, Receiver and Shannon conferred with U. S. National representatives. Shannon presented his evaluations of the two assets. Receiver proposed that United States National Bancshares, Inc., a bank holding company, purchase a package of receivership assets for a total consideration of

14. As testimony of Receiver and his attorney later disclosed, documentation and collateralization of the loans were in deplorable condition, typical of which were the following: personal loans failed to meet truth-in-lending requirements, thereby subjecting any Bank which held them to damages and penalties; many loans were undercollateralized; the evidence of debt for some loans contained serious omissions; automobile loans failed to include the certificate of ownership; where stock was used as collateral, the usual assignment or endorsement was missing; and property descriptions as well as appraisals for real estate loans were vague and sometimes missing.

15. After a distinguished career as federal bank examiner, Shannon served the Alamo National Bank of San Antonio, Texas as President and then Chairman of the Board of Directors.

16. This extensive review of the loan portfolio later served a second purpose. During the pendency of the receivership, a substantial number of loans became delinquent. Upon the urging of defendant, and consistent with his fiduciary duties, Receiver's counsel instituted foreclosure proceedings in order to collect the loans or obtain title to the collateral. The prior review and evaluation of each loan expedited the collection procedures.

$3,400,000.00.[17] Included in the package was Moody's stock in First State Bank of Hitchcock to be held by the holding company; the loan portfolio to be held by U. S. National; and the premises of the Bank. Receiver had determined that the Bank building and lot met the distance criteria of 500 feet from the U. S. National building, which would permit U. S. National to operate a branch at the Bank location.

After careful and extensive negotiations, the parties reached tentative agreement that the above package of assets would be sold to and purchased by U. S. National for a consideration of $3,100,000 in cash and a loan to Moody of $400,000.00.

On October 16, 1972 Receiver informed Moody's attorney of the proposal. Receiver suggested that if Moody would provide $3,400,000 in cash to pay depositors, the proposed sale of bank to U. S. National would be dropped. Alternatively, Receiver proposed sale of certain assets of the receivership for $3,000,000, with a loan from the family of $400,000. Receiver made it clear to Moody and his family that if Moody could not or would not provide the necessary funds, either in the manner suggested or in some other, Receiver intended to recommend that the Court order sale of the assets to U. S. National. The Receiver's proposal was taken under advisement by the Moodys.

On October 18, 1973 Receiver caused a proposed letter agreement embodying the terms of the proposed transaction with U. S. National to be prepared. On October 19, Receiver applied for Court approval of the letter agreement. The application was set to be heard on October 26. Receiver estimated he could begin paying depositors within two business days after approval of the proposed sale. Thus, within the six weeks subsequent to his appointment, Receiver had arranged payment to all government and outside depositors. He determined how much money was needed, what assets were available for liquidation, and devised a definite and certain plan to obtain the cash.

Receiver's fund raising efforts from September 7 to October 19, 1972 were in marked contrast to the activity of Moody during the same period. Originally, Moody claimed the Bank's liquid assets would provide the necessary cash to pay depositors. That assertion was proven incorrect at the September 20, 1972 hearing at which the receivership was expanded.

Next, defendant contended the total liquid assets in the receivership were sufficient to provide the requisite cash. Based on his own review of the assets, buttressed by the independent audit by accountants and by Shannon's evaluation of the Hitchcock Bank stock and the loan portfolio, Receiver concluded that only through the additional sale of the Bank premises could the receivership assets generate the needed cash. The court finds that a sale of Moody's assets which did not include the Bank premises would not have produced sufficient cash. Had Receiver's proposal been consummated, its effect would have been liquidation of the Bank. Such liquidation would have been necessary if outside depositors were to be paid out of cash generated solely from receivership assets.

Moody and family, acting through their representatives, contended as early as September 20, 1972, that if additional funds were necessary, the Moody family was ready and willing to provide them. In fact, at the time such statements were being issued, the family members were still negotiating with each other over the details of performance. The Moodys disagreed over the amount each would supply, which lender would be repaid first, and what security defendant would supply. As defendant's counsel admitted, the family members did not

---

17. The figures quoted above suggest that slightly more than $3.2 million would pay all outside depositors. That figure does not include accrued interest on interest-bearing accounts or the expense of the receivership.

settle their differences until October 25, the eve of the hearing on Receiver's application to sell assets under the plan set forth in his letter agreement with U. S. National.

At the October 26, 1972 hearing, Moody's attorney dramatically announced that the necessary $3,400,000 would be produced by the family within twenty-four hours. The arrangements were completed not in twenty-four hours, but on October 30, four days later. Moody presented his proposal in a written application to the Court. The Court then approved defendant's application in preference to the sale of assets proposed by Receiver, for several reasons.[18] First, it provided the cash with which to pay the outside depositors, the agreed objective. Secondly, it served to acknowledge the responsibility and obligation of defendant and the Moody family to trusting depositors who had relied on the Moody name for security. And thirdly, it preserved the residue of receivership assets for defendant. On November 2, 1972, an appropriate order was entered. Thereafter, the Moody family provided Receiver with $3,400,000 in cash. Combined with funds already in hand, Receiver then had sufficient cash to pay all outside depositors in full, including interest through October 31 on interest bearing accounts. Payments began the following day, November 3, 1972—fifty-eight days after entry of the Final Judgment and Order Appointing Temporary Receiver.

Despite persistent promises to do so, the Moodys for several weeks failed to produce the cash for paying outside depositors, some of whom were in desperate need of their money. Suddenly, after Receiver devised and set in motion a plan to raise the money by liquidation of the Bank, the Moodys came forth with the cash. Accordingly, the Court finds that the Moodys' motivation in producing the funds was not concern for Bank depositors, but was their desire to keep the Bank and other receivership assets within the family.

For the duration of these proceedings, defendant has attempted to take credit for the successful conclusion of the receivership through full payment to all government and outside depositors. At the same time he has denigrated the skillful and successful efforts of Receiver to this end.

The truth of the matter is that Receiver, E. O. Buck, acting under the Court's authority, was responsible for payment in full to all government and outside depositors. Receiver was ready on October 26, 1972 with a plan to pay depositors. Had the Moodys not provided funds, the Court would have approved the sale to U. S. National and depositors would have been paid promptly. Receiver's readiness spurred the Moodys to agreement and production of funds. The Court is convinced that had Receiver listened to defendant's promises of additional funds and refrained from negotiating the proposal for sale of the assets to U. S. National, the family would have continued to haggle internally while depositors remained unpaid.

F. Delay in Termination of the Receivership.

Beginning November 3, Receiver and his staff paid outside depositors in person at the Bank and later sent out-of-country outside depositors drafts by mail. By November 22, Receiver had paid out $5,179,244.01. Remaining un-

18. On October 31, the State of Texas filed a Plea in Intervention objecting to defendant's proposal because (1) it subordinated the account of Empire Life Insurance Company, a Moody-related depositor then in state receivership, to other accounts, and (2) the lien to be held by Robert L. Moody on defendant's assets might prejudice other creditors. The State supported Receiver's proposal and urged its adoption by the Court.

To satisfy the first objection, all parties agreed that Receiver would deposit 6,400 shares of stock in the Hitchcock bank in an independent Houston bank to secure half of the Empire Life time account. The Court approved the plan over the State's second objection.

paid were 1219 outside depositors' accounts totaling $221,341.62. The Bank's escheat account contained an additional $23,307.28.

On December 19, 1972, the Court commenced trial in Houston on Receiver's Final Report, Accounting and Application, and related matters. At the outset, Robert Brown, Esq. of Liddell, Sapp, Zivley and Brown, representing Receiver, sought to have defendant Moody testify. Defendant's counsel responded that Moody was unavailable because he was seriously ill with hypertension and receiving treatment in a Durham, North Carolina hospital. Brown asserted that because Moody's appearance was necessary, adequate proof should be required of any disability preventing his appearance to testify. A Galveston doctor who had treated Moody testified. Because he had not seen defendant for more than one month, his testimony was deemed insufficient.

On the following day, the Court learned that Moody was not hospitalized but was residing at an apartment in Durham. Receiver moved pursuant to Fed.R.Civ.P. 35 for a physical examination of Moody to determine his fitness to testify. The Court granted the motion. Later, the Order was amended to require defendant's attendance at Court on January 3, 1973, or alternatively, his examination at a Houston hospital by a court-appointed panel of doctors. Defendant's counsel vigorously urged that Moody's health would not tolerate travel to Texas. He promised to produce defendant's medical records to substantiate that claim. He later provided limited records from North Carolina. Upon review of the records, the medical panel concluded travel to Houston probably would not endanger Moody's health. In view of this finding, the Court's order was not modified.

On January 2, defendant's counsel applied for a stay of the Court's order that

Moody appear on January 3. A single page affidavit attached to the application merely stated that Moody's condition was very serious and he should not travel. The doctor opined that Moody should not resume normal activity until May 15. When Court convened January 2 to consider defendant's application, defendant's counsel promised to provide all current medical records.

It appeared to the Court that defendant was consciously avoiding appearance. The Court noted that although ample time had elapsed for presentation of complete medical information, no competent medical evidence theretofore produced supported the contention that a court appearance would endanger Moody's health. Moody's doctor had suggested that Moody's condition would allow normal activity by May 15. Although unconvinced of the seriousness of Moody's condition, the Court accorded Moody the benefit of the doubt and continued the hearing until May, as recommended in his doctor's affidavit.[19]

Moody's appearance and testimony, after his long absence from these proceedings, were necessary for a number of reasons. Moody's attorney had represented that Moody's illness prevented him from having full control over business judgment. That raised the question of whether Moody had been competent to authorize the actions taken and representations made in his name. In Moody's absence, a shifting coterie of attorneys, relatives and advisors purported to represent defendant. Apparent and potential conflicts of interest between these individuals and Moody called into question actions taken on Moody's behalf. Also, statements made in Moody's name had tended to discredit the value of the receivership and of Receiver's contribution. The attorney for Receiver had the right and duty before termination of the receivership to dispel any doubt concerning the above questions and issues.

19. Moody's counsel submitted additional medical records on January 9. The medical panel found the records did not suggest that

Moody could not travel or testify. Nevertheless the Court decided to await the May 21 date.

On May 21, Moody testified and resolved the questions raised by his absence. He evidenced clear awareness of all proceedings and a basic understanding of actions taken during the receivership. Acknowledging the potential conflicts of interest, he nonetheless expressed confidence in his attorneys and advisors. Moody ratified and confirmed all prior actions taken in his name. And finally, Moody declared his satisfaction and approval of what the receivership had accomplished. He acknowledged that his financial and legal position and the impending lawsuit made the receivership necessary. Moody expressed satisfaction that Receiver had performed his duties fully and faithfully. His only complaint related to the requested fees, which of course, gave rise to his criticisms above discussed.

Moody's testimony about activity and diet in North Carolina suggested treatment through rest and regulation of diet, without medication. Without explaining why travel to Galveston in December, 1972 would have been harmful to him, Moody admitted traveling to Virginia after Christmas and to Washington, D. C. in March or April.

A private investigator hired by Receiver's attorney, then testified. He contradicted Moody's version of his personal habits with details of constant visitors to Moody's apartment, late hours, and trips to night clubs. Significantly, during the eight days of surveillance, the investigator did not see Moody visit a doctor's office, or a medical facility, or eat special foods.

The Court finds that appearing and testifying in Court in December, 1972, or any time thereafter would not have adversely affected Moody's health. Because of his absence from proceedings from September to December, 1972, Moody's testimony was necessary to the proper and orderly termination of this matter. Postponement of that testimony and the consequential delay in closing the receivership were solely due to defendant's deliberate election to remain unavailable until May, 1973.

Because of the lengthy delay in terminating the receivership, Receiver submitted a First Supplement to the Final Report on May 15, 1973, updating the accounting and recitation of events and requesting additional fees. Subsequent to Moody's testimony, Receiver and his attorney testified concerning their activities since December.

From December 2, 1972 to April 30, 1973, $184,959.49 was paid to outside depositors. Remaining unclaimed on April 30 were 635 accounts containing $28,676.66. The escheat account totaled $30,890.40. Collections on notes totaled $499,762.21.

A substantial number of notes became delinquent during the receivership. Moody considered some uncollectible and moved the Court to release them from receivership in order that he might deduct the losses on his 1972 federal income tax return. This request was granted. Defendant's attorney requested Receiver's attorney to vigorously pursue all other delinquencies.

Receiver's attorney sent collection letters and filed seventy-two collection suits. This activity, although beyond the anticipated scope of activity of Receiver's attorney, was approved by the Court because of defendant's request. It consumed considerable attorney time.

During the hearings, the parties agreed on the propriety of most receivership expenses. These have since been paid. Note payments, revenues from Receiver's investments, and other sources provided Receiver with considerable funds in excess of those needed to close out the receivership. Receiver has paid over $1,350,000 of this cash to defendant. Remaining in receivership are the Bank buildings, its contents and records, the loan portfolio, $591,000 in cash, loan payments since July 17, 1973, and proceeds from investment of funds on hand.

## III. Evaluation of Performance and Determination of Fees

### A. The Temporary Receiver

■ Expert testimony in this case, judicial opinions in other cases, and legal treatises, recite the many factors to be considered in affixing a receiver's compensation.[20] In general, a reasonable fee is based on all circumstances surrounding the receivership. Accordingly, although authorities provide convenient guidelines, the unique fact situation of each case renders direct reliance on precedent impossible. In re Westec Corp., 313 F.Supp. 1296, 1302 (S.D.Tex. 1970). In re Yuba Consolidated Industries, Inc., 260 F.Supp. 930, 939 (N.D. Cal.1966). Also, the age of many cases distorts dollar valuations. E. g., Bowerstock Mills & Power Co. v. Joyce, 101 F.2d 1000 (8th Cir. 1939). The Court deems several factors particularly significant in this case.

### 1. *The results achieved by Receiver.*

■ Results are always relevant. Compare, United States v. Code Products Corp., 362 F.2d 669 (3rd Cir. 1966). Because a large number of people were significantly affected in this instance, Receiver's accomplishments were unusually important here and should considerably influence his compensation.

The receivership must be considered an outstanding success, for which Receiver must receive primary credit. He handled routine tasks with efficient dispatch combined with careful attention to detail. Crises, such as the local governments' need for payroll funds, were dealt with effectively. Finally, Receiver promptly and completely accomplished the central task, full payment to outside depositors, the unsecured depositors.

Receiver acted promptly in the several instances where timeliness was important. Expansion of the receivership was sought before any assets were dissipated. Receiver quickly provided payment to government depositors. Sale of government securities was arranged and consummated before a rise in interest rates. A multimillion dollar arrangement for disposal of other assets was negotiated successfully and with dispatch. The schedule of payment to depositors reflects such promptness. Local government depositors were completely paid one month after institution of the receivership; payment to private depositors began within two months after Receiver's appointment.

Receiver accomplished this without assistance from defendant and his associates, and in some instances despite their interference. Moody was personally unavailable to Receiver and of no as-

20. Stuart v. Boulware, 133 U.S. 78, 82, 10 S.Ct. 242, 244, 33 L.Ed. 568 (1890) :

The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs entrusted to him, and the perplexity and difficulty involved in that management.

City of New Orleans v. Malone, 12 F.2d 17, 19 (5th Cir. 1926) :

In determining the amount of their compensation, due consideration should be given to the amount realized, as well as the labor and skill needed or expended, and other circumstances having a bearing on the question of the value of the services.

United States v. Admiral Refining Co., 146 S.W.2d 830, 831–832 (Tex.Civ.App.—Texarkana 1940, no writ) :

All of the material facts and circumstances of the particular case are to be consid-

ered. * * * The considerations that should be controlling with the court in fixing compensation are the value of the property in controversy; the practical benefits derived from the receiver's efforts and attention; time, labor and skill needed or expended in the proper performance of the duties imposed, and their value measured by the common business standards; and the degree of activity, integrity, and dispatch with which the work of the receivership is conducted.

Coskery v. Roberts & Mander Corp., 200 F.2d 150, 154 (3rd Cir. 1952) ; Roberts v. Howe, 125 S.W.2d 617 (Tex.Civ.App.—Dallas 1939, no writ). See also, 2 Clark, Law of Receivers § 641(a) (3rd ed. 1959) ; High, A Treatise on the Law of Receivers, 918–19 (4th ed. 1910), Annot. 6 A.L.R.Fed. 817 (1971).

sistance. Moody's representatives opposed expansion of the receivership. They interfered with the sale of government securities, suggesting unrealistic alternatives. Defendant, his family and their representatives promised but did not timely deliver, the necessary funds for paying off outside depositors. This undermined Receiver's negotiations by casting doubt on Receiver's offers to sell assets. This opposition increases the significance of Receiver's accomplishments. In re Garrett Road Corporation, 256 F.Supp. 709, 713 (E.D.Pa.1966).

2. *Ability, reputation and other professional qualities of Receiver necessary for the job.*

Receiver's qualifications have been mentioned in detail. His abilities were well utilized. Stuart v. Boulware, 133 U.S. 78, 82, 10 S.Ct. 242, 33 L.Ed. 568 (1890). Compare, In re General Economics Corp., 360 F.2d 762 (2nd Cir. 1966).

Receiver had virtually all the powers and responsibilities of a bank president. Although the Bank was not open in the fullest sense, and checks and deposits were not accepted, nevertheless, the Bank as such was very active. Security problems were handled. Books and records were kept. Interest on time deposits was computed and credited to accounts. Loan collections were made. After funds were received, payments to depositors were arranged and made. Funds were invested to produce additional profits. This receivership, however, required more than the usual talents of the president of a medium-sized bank. The sale of the government securities and the negotiation for sale of other properties were extraordinary actions requiring exceptional experience and abilities.

In addition, Receiver's reputation and experience contributed to his acceptance by those with whom he dealt, as well as the success of his endeavors. Receiver's personal contacts were instrumental in the prompt recovery of funds due from other banks and were critical to the successful sale of government securities. Receiver's relationship with other banks and bankers were also significant in negotiations with the U.S. National.

In short, a receiver's abilities, as required by the tasks of the receivership, must be accorded considerable weight in determining compensation. Buck's exceptional ability and reputation were very necessary in this receivership.

Defendant suggests the salaries of Galveston bank presidents as the applicable standard of comparison. The analogy is inappropriate. Receiver's responsibilities and duties were far more difficult and complex than those of regular bank presidents.

3. *Size of the estate and its ability to afford the expenses and fees.*

These factors must be given considerable weight. Because of the efforts of Receiver, this estate can well afford to reasonably compensate Receiver and his attorney. Finn v. Childs Co., 181 F. 2d 431 (2nd Cir. 1950); In re Polycast Corp., 289 F.Supp. 712 (D.Conn.1968); Smith, The Law of Receivership § 350, p. 584 (1897).

In some cases compensation is fixed as a percentage of the funds in receiver's hands. United States v. Larchwood Gardens, Inc., 404 F.2d 1108 (3rd Cir. 1968); Commonwealth v. Traders' & Mechanics' Bank of Pittsburg, 268 Pa. 526, 113 A. 186 (1920). The Bankruptcy Act, 11 U.S.C. § 1 et seq., utilizes this approach. Receivers are appointed in bankruptcy where protection and preservation of the property are necessary. The receiver may be appointed merely to take charge of the property and protect the interests of creditors. 11 U.S.C. § 11(a)(3). The Court can also empower the receiver to conduct the business of the bankrupt. 11 U.S.C. § 11(a)(5). A receiver serves until the trustee is qualified or the petition is dismissed. 11 U. S.C. § 11(a)(3).

Compensation to equitable receivers is analogous to compensation to receivers in bankruptcy. In re Garrett

Road Corp., supra. The compensation provisions of the Bankruptcy Act categorizes receivers depending on their responsibility and allows compensation accordingly.[21]

In this matter, Receiver has paid depositors a total of $24,032,221.81 and creditors a total of $184,407.70. Disbursements to date total $24,216,629.51.[22] Under the Act, a custodian could be allowed a maximum of $121,098.14. A receiver with full powers could be paid $242,306.29. An appointee who conducted the business could receive a maximum of $484,612.58.

In this case, Receiver was quite clearly more than just a custodian of the receiver assets. Because he liquidated a large portion of the assets and carried on much of the business, Receiver had more than "full powers." In fact, Receiver was all but operating the business. Although the publicly visible operation of the Bank was suspended, extensive activity was continuing. Thus, if this were an ordinary bankruptcy matter, Receiver could reasonably be paid $484,612.58, the maximum allowable under the Bankruptcy Act. By

way of contrast, Receiver requests $175,000, substantially less than the Act would allow a receiver with full powers. Moody proposes $25,000, only 20% of what the Act would allow a custodial receiver.

The maximum fee established by the Act is of course not mandatory. Brody, Appointment of Receivers, 39 Ref.J. 125, 126 (1965). However, one referee has stated that "the ceilings are moderately low and the general practice is to allow the maximum in most instances." Snedecor, Fees and Allowances in Straight Bankruptcy, 40 Ref.J. 26 (1966).

In one respect, the figures provided by reference to bankruptcy might be considered high. This receivership involved high value assets. In comparison to most bankruptcy estates, much of this estate was cash, or convertible to cash. Accordingly, the work required to liquidate the assets perhaps consumed less time than would be required in a receivership involving more diverse assets. Use of percentages without consideration of work expended may tend to overcompensate the receiver who holds high value assets. See Commodity Credit

21. 11 U.S.C. § 76 provides:

(a) The compensation of receivers appointed under this title, for their services payable after they are rendered, shall be as follows:

(1) As custodians. Receivers appointed pursuant to clause (3) of subdivision (a) of section 11 of this title who serve as mere custodians shall receive such amount as may be allowed by the court, but in no event to exceed 2 per centum on the first $1,000 or less and one-half of 1 per centum on all above $1,000 on moneys disbursed by them or turned over by them to any persons, including lienholders and also upon moneys turned over by them to the trustees and on money subsequently realized from property turned over by them in kind to the trustee.

(2) With full powers. Receivers appointed pursuant to clause (3) of subdivision (a) of section 11 of this title who serve otherwise than as mere custodians shall receive compensation by way of commissions upon the moneys disbursed or turned over to any persons, including lienholders, by them and also upon the moneys turned over by them or afterward realized by the trustees from property turned over in kind by them to the trustees, such amount as the court may allow, but in no event to exceed 6 per centum on the first $500 or less, 4 per centum on all in excess of $500 but not more than $1,500, 2 per centum on all above $1,500 and not more than $10,000, and 1 per centum on all above $10,000.

(3) Conducting business. Receivers appointed pursuant to clause (3) of subdivision (a) of section 11 of this title who conduct the business of the bankrupt as provided in clause (5) of subdivision (a) of section 11 of this title, shall receive such amount as may be allowed by the court, but in no event to exceed twice the maximum allowance permitted by paragraph (2) of this subdivision.

22. In considering the value of the property in controversy as a criteria for fixing Receiver's fee, the total assets in the receivership exceeded the $24,216,629.51 actually disbursed to date. There is additional cash and other assets presently in the receivership which reflect a value of the property in controversy considerably in excess of the $24,216,629.51 heretofore disbursed.

Corp. v. Bell, 107 F.2d 1001 (5th Cir. 1939); 3 Michie, Banks and Banking, Ch. 6, § 99 (1940).

In other respects, use of the bankruptcy analogy tends to disadvantage an equitable receiver. No receivership is intended to generously reward court-appointed officers. In re Gilbert, 276 U.S. 294, 48 S.Ct. 309, 72 L.Ed. 580 (1928); Guaranty Trust Co. v. Seaboard Air Line Ry. Co., 68 F.Supp. 304 (E.D.Va. 1946). Nevertheless, a very stringent "spirit of economy" pervades the bankruptcy cases and statutes. In re Imperial "400" National, Inc., 432 F.2d 232 (3rd Cir. 1970); In re Mt. Forest Fur Farms of America, 157 F.2d 640 (6th Cir. 1946). Costs and expenses in the administration of a bankruptcy tend to reduce the amount available to creditors. Massachusetts Mutual Life Insurance Co. v. Brock, 405 F.2d 429 (5th Cir. 1968); Finn v. Childs Co., supra. The Courts strive for economy of administration to preserve the estate for creditors. Under this climate, an individual serving as receiver in bankruptcy can receive far less compensation than he would on a private basis. Massachusetts Mutual Life Insurance v. Brock, supra; In re Mt. Forest Fur Farms of America, supra. In this case, all creditors have been paid in full. As a result of Receiver's excellent stewardship, additional funds remain. Thus, the bankruptcy rationale, that costs reduce the share to be paid creditors, does not apply.

■ In a very real sense, defendant Moody, faced with a financial and legal crisis, obtained the Court's protection for his assets. Under the Court's auspices, Receiver, an expert in banking and finance, reorganized Moody's assets and paid his creditors. He is entitled to reasonable rather than niggardly compensation for this service. Newton v. Consolidated Gas Company, 259 U.S. 101, 42 S.Ct. 438, 66 L.Ed. 844 (1922).

### 4. *Time required to conclude receivership.*

Defendant stresses time as the critical factor. Defendant argues Receiver was most active from September 7, the date of his appointment, to around December 12, when the bulk of depositors had been paid. Conceding that Receiver worked long hours of every day during this period, defendant contends that Receiver thereafter served only as caretaker of remaining deposits, collector of loan payments and preparer of reports. Defendant maintains that Receiver's compensation should be determined on the basis of time spent during this initial period and should be minimized.

■ Some cases support defendant's contention that time spent by a receiver is the all important consideration in determining his fee. E. g., In re Hudson & Manhattan R. R. Co., 224 F.Supp. 815 (S.D.N.Y.1963). Other authorities criticize this position, maintaining that the results achieved by a receiver should be considered more significant. Paskay, Handbook for Trustees and Receivers, § 6.004 [1] (1972); Rudin, Allowances in Chapter XI Proceedings, 40 Ref.J. 29 (1966); See also Massachusetts Mutual Life Insurance Co. v. Brock, supra.

In this case, the Court adheres to the latter view. In receiverships generally, and in this case in particular, prompt and intelligent action was vital to the preservation of the receivership assets and the discharge of Moody's obligations to his depositors. In re Polycast Corp., supra. Defendant's position would reward slowness in decision and action. According to defendant's position, if it had taken Receiver six months to arrange payment to depositors he should receive more than he is entitled to for making the arrangements within two months. This is a perversion of the purposes of a receivership.

Time spent cannot be ignored. Receiver devoted more than full time to this matter from September 7 to the end of the year. Since then, the work has been intermittently requiring Receiver's full attention. Nevertheless, responsibility for the remaining assets, including the Bank premises, as well as the collection of notes, has continued. This has prevented Receiver from undertak-

ing any other full time assignment. Thus the receivership has required a considerable portion of Receiver's time.

At present, Receiver is preparing the records and assets for return to defendant. When this has been accomplished and the receivership terminated, Receiver's compensation will be affixed, consistent with this opinion, and with consideration given for this final work. In addition, Receiver's reasonable expenses shall be reimbursed.

## B. Receiver's Attorney.

Legal questions and problems have permeated this receivership. Without timely and effective legal counsel from his attorney, Charles Sapp, Receiver could not have been successful in his assignment.

An equitable receivership is by its very nature, a legally complex process. The receiver's relationship with the Court, the parties, and the public, are all defined by common law principles. Any important decision required evaluation of these relationships. Receiver's power and authority are dictated by the Court's orders. Considerable analysis and drafting ability are necessary to request and prepare appropriate orders. Finally, a receiver's lawful possession of assets must be adequately documented to satisfy potential transferees. Here again, a clear understanding and application of the law, as well as draftsmanship, become important.

Receiver here required peculiar legal work for which the banking experience of his attorney's law firm was required. A review of all receivership assets was undertaken to determine ownership and disposability. Initially this involved only Bank assets and liabilities. After expansion of the receivership, it included Moody's other assets.

The review encompassed a wide variety of assets and liabilities, reflecting Moody's divergent business interests.

The attorneys reviewed Moody's title and other evidence of ownership, and evaluated encumbrances and ownership claims of others. After the items were examined and categorized, Receiver disposed of many receivership assets and negotiated liquidation of many other assets. In each instance his attorney advised as to the legal status of the item to be transferred, and the means and documents necessary for an effective transfer.

This process was complicated by the Bank's unique status as a proprietorship. Moody treated the Bank assets as his own, as indeed they were. But, he intermingled Bank resources with other business affairs. He loaned Bank money to his other businesses and to Bank officers. He misrepresented the condition of the Bank on its published statement. And he traded or encumbered Bank assets to benefit ·his other interests. As a private bank, W. L. Moody & Co., Bankers (Unincorporated) was not subject to federal and state banking regulations proscribing such action. Thus, Moody's mingling of banking affairs with other interests may not have been improper. Nevertheless, it complicated the legal evaluation of the assets. In this and other ways, the legally unique status of the Bank resulted in difficult legal work.

Several unusual problems arose requiring legal counsel. One problem was Moody's absence and reported, but unproven, illness. Moody's continued unavailability generated questions as to his competency, the authority of his representatives, and the possibility of a later claim by Moody against Receiver. Receiver's attorney defined the legal problems and devised the means to resolve them.

■ Through subpoena and motion, Receiver's attorney sought Moody's presence. As detailed above, the Court eventually ordered Moody to appear and

testify.[23] When he did, the legal questions raised by his absence were answered.

Other problems included the subpoena duces tecum the Internal Revenue Service served on Receiver October 31, as he was preparing to pay depositors.[24] The subpoena required production of virtually all Bank records. Receiver's attorney reviewed the questions involved and filed an answer resisting immediate compliance. This timely action prevented delay in payment to depositors. Subsequently defendant intervened and contested the subpoena.

After trial, the Court ordered compliance. United States v. Buck, 356 F. Supp. 370 (S.D.Tex.), aff'd 479 F.2d 1327 (5th Cir. 1973), cert. denied 414 U.S. 1097, 94 S.Ct. 732, 38 L.Ed.2d 555 (1973). Due to delay occasioned by Moody's appeal, the Internal Revenue Service has not been given access to Moody's records. Final action of the appeal has been taken and the mandate returned to this Court. An appropriate order will be entered forthwith. Nevertheless, prompt action by Receiver's attorney in opposing the subpoena preserved Moody's rights until they could be finally determined.

On February 6 defendant's attorney served the Court and Receiver with a petition for a writ of mandamus, to be filed with the United States Court of Appeals for the Fifth Circuit. Defendant sought to require this Court to terminate the receivership immediately. Receiver's attorney opposed the petition before the Fifth Circuit because important matters were yet to be resolved. The Court of Appeals denied the writ.

■ As with Receiver's compensation, the fee paid his attorney is determined in the Court's sound discretion upon review of all surrounding circumstances.[25] Unlike receiver's fee, no analogous section of the Bankruptcy Act provides guidance. 3A Collier's Bankruptcy § 62.12[1] (14th ed. 1972). In evaluating this case, the Court heard expert testimony and has surveyed the relevant authorities.[26]

A basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them. American Exchange Life Ins. Co. v. Willis, 433 S.W.2d 945 (Tex. Civ.App.—Tyler 1968, no writ). The Court chose Sapp and his firm because of their well known legal expertise in the banking field. This receivership has required the full measure of the firm's special competence.

Some work was relatively simple, such as collecting delinquent loans as requested by defendant. Other work was more difficult, for example, reviewing the loans. The great bulk of the legal work, however, was very sophisticated. As described above, the work was involved and technical, requiring lawyers who specialized in the banking field. Yet the problems were unique to experts and re-

23. As part of his effort to ascertain Moody's medical condition, Receiver's attorney hired a private investigator to trace Moody's movements. The investigation refuted Moody's claim of serious illness.

The investigator's fee has been included in the expenses for which Receiver's attorney seeks reimbursement. Defendant heatedly contests the need for the investigator and would have the Court deny this expense. The Court finds employment of the investigator proper. Such action was reasonably necessary to resolve the problems raised by Moody's absence and to the orderly termination of the receivership. Accordingly the charge for the investigation will be allowed as an expense of the receivership.

24. United States v. Buck, 356 F.Supp. 370 (S.D.Tex.1973), aff'd, 479 F.2d 1327 (5th Cir. 1973).

25. Commodity Credit Corp. v. Bell, 107 F.2d 1001 (5th Cir. 1939), United States v. Admiral Refining Co., 146 S.W.2d 830 (Tex.Civ. App.—Texarkana 1940, no writ), 2 Clark, Law of Receivers § 642(a) (3rd ed. 1959).

26. E. g., Texas Bank & Trust Co. v. Crippen, 235 F.2d 472 (5th Cir. 1956) ; Braswell v. Braswell, 476 S.W.2d 444 (Tex.Civ.App. —Waco 1972, no writ) ; In re Westec Corp., 313 F.Supp. 1296 (S.D.Tex.1970) and the authorities quoted therein.

quired imagination, diligence, and plain hard work.

A closely related factor is the time and effort expended in advising Receiver. City of New Orleans v. Malone, 12 F.2d 17 (5th Cir. 1926). Receiver's attorney testified on June 15 that he and 17 of his colleagues spent 2,369.75 hours on this matter. He estimated an additional 100 hours would be necessary to terminate the receivership.

■ The hours spent do not totally reveal the significant concentration of effort expended. The bulk of this legal advice was provided during the first two months of the receivership. Five lawyers began working full time immediately after Sapp's appointment on September 7, 1972. Other lawyers were called in as necessary. Sapp promised the Court he would give the highest priority to this representation. As the Court anticipated, the receivership required a significant level of legal counsel. As promised, a high priority was given the work. Other work pending in the office was put aside. Attorneys spent nights, weekends, and holidays working on this project. The priority given the work by the attorney is a significant factor in affixing his fee. Braswell v. Braswell, 476 S.W.2d 444 (Tex.Civ.App.—Waco 1972, no writ).

The results achieved by this effort, a very relevant factor, were impressive. In re Westec, supra. In situations requiring prompt action by Receiver, his attorney provided the necessary legal advice immediately. Because the manpower devoted to the receivership, Receiver obtained rapid legal instruction regarding all proposals. Where necessary, the attorneys promptly sought orders of the Court authorizing action.

Throughout this receivership, the Court has been consistently impressed by the high quality of legal expertise, expeditiously provided Receiver in significantly complex matters. Credit for the outstanding success obtained by Receiver must be shared with his attorney.

■ The final significant factor to consider is the amount of money involved. In re Osofsky, 50 F.2d 925 (S.D.N.Y.1931); Vaughn v. Gunter, 458 S.W.2d 523 (Tex.Civ.App.—Dallas 1970, writ ref'd n. r. e., 461 S.W.2d 599). No analogous statute affixes fees on the basis of assets involved. Nonetheless, the level of assets involved evidences the responsibility attendant to the representation. In this case, both the total value of assets in receivership and the value of transferred assets are high.

Defendant contends a relatively small fee is required. He errs, however, by overemphasizing the time spent by lawyers as the controlling factor. Ranger Insurance Co. v. Algie, 482 F.2d 861, 864 (5th Cir. 1973). Although time is a material factor, the difficulty of the job, the expertise necessary to accomplish it, and the results achieved are more significant here. Franklin v. City of New York, 144 F.2d 571 (2nd Cir. 1944); Rudin, Fees and Allowances to Attorneys in Bankruptcy and Chapter X Proceedings, 34 Fordham L.Rev. 387 at 399 (1966).

Defendant's preoccupation with time would reward the slow, inexperienced, single practitioner and prejudice the efficient, knowledgeable attorney with a reservoir of expert associates and partners upon whom to call as needed. Note, Compensation of Attorneys in Bankruptcy Proceedings, 32 Albany L.Rev. 407 (1968). Similarly, defendant's focus on the percentage of work done by Sapp, compared to the amount done by partners and associates is misdirected. Although relevant, this analysis obscures the fact that Sapp supervised the work and took full responsibility for its quality. Defendant's view also ignores the fact that the work itself was of exceptional quality.

■ Finally, defendant overemphasizes the principle of economy. Again, this principle is justified by the usual absence of available resources in a bankruptcy setting. Note, Compensation of Attorneys, 42 N.Y.U.L.Rev. 142 (1967).

Where, as here, the estate contains sufficient resources to compensate the Receiver and his attorney at commercially acceptable rates for services of considerable benefit to defendant, it would be unreasonable not to do so. E. g., In re Owl Drug Co., 16 F.Supp. 139 (D.Nev. 1936), aff'd sub nom., Cohn v. Edler, 90 F.2d 823 (9th Cir. 1937).

The Court finds and concludes that Receiver's attorney provided expert, efficient legal services on a high priority basis to quickly resolve the complex and difficult legal problems of the receivership. Receiver's attorney is presently occupied with the legal mechanics of terminating the receivership. When this has been accomplished, Receiver's attorney's compensation will be affixed, consistent with this opinion, and with consideration given for this final work. In addition, Receiver's attorney shall be reimbursed for his costs which were reasonably necessary to the services rendered.

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a). To the extent that any finding of fact constitutes a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law constitutes a finding of fact, it is hereby adopted as such.

The parties are presently arranging the transfer of records and assets to Moody and inspection of records by the Internal Revenue Service. When such arrangements have been concluded, Receiver's attorney shall prepare and submit a Final Judgment of Termination for entry by the Court. Final fees shall be affixed, and costs assessed in that judgment.

The Clerk shall file this memorandum opinion and furnish copies to all counsel.

## SUPPLEMENTAL MEMORANDUM

On January 2, 1974, the Court met in chambers with counsel. They were requested to confer relative to the mechanics of terminating the receivership. Various possible procedures were discussed. Subsequently, disposition of the IRS-subpoenaed materials was agreed to by all concerned. A review of bank records, assets, and premises by defendant's representatives took place. And, counsel conferred as requested.

The Court met with counsel again on January 16. The Court's Memorandum and Order was delivered to counsel and filed. Receiver's attorney presented a letter detailing his proposals for termination.

On January 17, Receiver filed his Second Supplement to Final Report (hereinafter Second Supplement), relating the course of the receivership from May 1, 1973 to December 31, 1973. The Second Supplement requested additional compensation of $15,000.00 for Receiver and $25,000.00 for his attorney, for services provided during the interim. The Second Supplement also included itemizations of all claimed reimbursable expenses incurred by Receiver and his attorney during the receivership.

On January 21, 1974, while the foregoing arrangements were being completed, Barnett Mortgage Trust of Jacksonville, Florida (hereinafter Barnett) filed a claim with Receiver for $321,950.00. The claim is based on a purported letter of credit, purportedly issued by the Bank on May 15, 1972, well before the institution of the receivership. Barnett alleged it had not been entitled to payment until certain recently discharged responsibilities had been completed.

Receiver declined to honor the claim except upon order of the Court. Additionally, defendant's attorney advised Receiver that the signature on the purported letter of credit was not Moody's.

The Court conferred with counsel in chambers concerning the claim on January 28, 1974. Citing the size of the claim and the effort and time necessary to determine its validity, Receiver's attorney requested that the Barnett claim be severed from the receivership, with Moody to assume responsibility for defense of the claim and liability thereon,

if any. Moody's attorney likewise urged this procedure. Moody's attorney denied that Moody signed or authorized his signature to be placed on the writing, and has since filed a pleading containing such denial. Barnett argued that it was entitled to insure the collectibility of the claim by having it heard in the receivership proceedings.

The Court noted that the bulk of receivership moneys had been returned to Moody and that other legal remedies which would insure collectibility of the claim were possibly available to Barnett. The Court also expressed the view that termination of the receivership should not be delayed by this recent development. Finally, the Court gave Barnett time within which to consider such additional action as it might wish to take.

Barnett did not seek either a writ of attachment, Tex.Rev.Civ.Stat.Ann. Art. 275 et seq., or a writ of garnishment, Tex.Rev.Civ.Stat.Ann. Art. 4076 et seq.; Fed.R.Civ.P. 64. On February 6, 1974 Barnett did file a written application to the Court for payment of its claim. Defendant responded with written opposition to the claim, asserting it to be invalid. Receiver responded, reiterating his prior suggestion that the matter should be handled by Moody outside the receivership.

A preliminary hearing was had concerning Barnett's claim and other matters February 26, 1974. Barnett's counsel stated it would not be ready to prove up its claim for at least 30 to 60 days. Counsel admitted that the one page writing was the only support Barnett could offer as proof at that time. Counsel also admitted Barnett could not show that any prejudice would result from termination of the receivership, or that its legal remedies apart from the receivership were inadequate. Barnett simply appealed to the Court in its discretion to retain control over receivership assets until the claim could be fully adjudicated.

The Court again expressed its determination that the receivership be terminated promptly. It was suggested that the parties confer and consider other procedures for protecting Barnett's claim.

On March 8, 1974, Barnett presented a Motion to Retain Jurisdiction, in which the Court was urged to maintain control over the receivership assets until Barnett's claim was resolved. This motion must be denied.

The receivership is near termination. Requiring Receiver and his attorney to investigate and to make a determination of the claim would unduly delay termination and increase the receivership costs. Alternatively, Receiver and his attorney could be released and receivership assets sufficient to cover the claim, could be retained in the Registry of the Court. However, this would delay return of valuable assets to defendant without presently proven justification.

Despite the Court's and Moody's invitation to do so, Barnett has failed to seek either attachment or garnishment. These normal and usual procedures would insure both parties against unjustified or unanticipated loss. And finally, Barnett's position is different from that of ordinary depositors who have received the Court's protection during these proceedings. As a sophisticated financial institution, Barnett was put on notice of the Bank's unusual character by the term "unincorporated" in the Bank name and letterhead. It must have had notice of the pendency of the receivership proceedings and their anticipated early termination for a substantial period of time. Under the circumstances, Barnett's claim has not been timely presented. Accordingly, provision will be made for determination of the Barnett claim outside the receivership.

Barnett has asserted that diversity jurisdiction exists for its claim, independently of this receivership action. To prevent any possible prejudice of dismissal, the claim will be severed and shall proceed as an independent cause of action in this Court, as provided in the

Order signed and filed of even date, Fed.R.Civ.P. 21.

Following presentation of Barnett's motion at an in-chambers hearing on March 8, the Court advised all counsel of his concern with proposals previously made by counsel for payment to Moody of unclaimed funds, (a) belonging to Outside Depositors of Bank, itemized in Exhibits "A–1", "A–2", "A–3", "A–4", and "A–5" to the Second Supplement, and (b) held for payment of Missing Depositors of the Bank, shown in Exhibit "B" to the Second Supplement. Counsel for Moody urged upon the Court that these funds should be paid over to Moody at termination. No counsel objected to his position.

Since the hearing, the Court has given careful consideration to the proper disposition of such funds. It must be borne in mind that while such funds were deposited in Bank and as such were under the custody and control of Moody as sole proprietor at the time the temporary receivership was granted, such deposits were not and are not the property of Moody. It is not apparent to the Court how such deposits under any theory could become the property of Moody. Such deposits belong to the depositors, for the protection of which the receivership was granted. The Court has a continuing duty reasonably to protect such deposits for the rightful owners.

Moody personally and through his attorney has heretofore represented that he intended to reopen Bank, subject of course to the proscriptions and limitations of the Consent Decree entered at the outset in this cause. In addition to such assurances, Moody's attorney has submitted an unaudited financial statement in support of his contention that Moody has the financial ability to assume repayment of the above deposits upon demand. Notwithstanding such assurances, and based upon the entire record in this case and the applicable law, the Court is of the opinion delivery of such deposits should not be made to Moody before the Bank has been in fact reopened. If Bank is reopened and after expiration of 30 days thereafter, the Court would be in a position to assess its operation and make appropriate provision for such funds to be deposited in Bank to be held by it in trust for the rightful owners.

If Bank should not be reopened and operate as such for a period of 30 days, and bearing in mind that Moody, as well as the Court, has a right and duty with respect to the control and preservation of such deposits, the Court would upon application of Moody consider ordering the deposit of such funds in a bank located in Galveston, Texas in which Moody owns a substantial interest, as designated by Moody and approved by the Court, to be held by such bank in trust for the rightful owners.

Subsequent to the filing of the Second Supplement, defendant filed his objections. Defendant objected to the additional compensation requested, challenged any compensation to Receiver and his attorney for time and effort expended in attempting to establish and collect their fees, and resisted reimbursement of expenses incurred to that end. On February 26, 1974, defendant's objections were heard. Receiver and his attorney briefly outlined their work as explained in the Second Supplement. Counsel illuminated defendant's objections. Upon the request of Receiver's attorney, defendant's attorney stated that based upon the examination of Bank premises, records and assets, defendant had no objection to make as to Receiver's handling of those matters during the receivership.

From May 1, 1973 to December 31, 1973, activity at the Bank was very limited. Only a trickle of depositors sought payment and $1,346.93 was paid out during the eight (8) months. Collections on loans continued, and books and records were regularly updated. Receiver and his attorney instituted additional collection suits as requested by defendant; other suits progressed to settlement or judgment. As of December 31,

1973, these collection efforts produced $124,844.93 for the receivership. Other than the hearings on fees, only a few matters were handled in this Court from May 1 to December 31, 1973. Receiver's attorney, his partners and his associates devoted 343 hours to the receivership from June 13, 1973 to December 31, 1973. Of this time, 49¼ hours were spent on their claims for compensation.

■ As defendant contends, time and effort spent and expenses incurred in proving fees are not compensable. In re Imperial "400" National, Inc., 432 F. 2d 232, 239 (3rd Cir. 1970); United States v. Larchwood Gardens, Inc., 420 F.2d 531, 534 (3rd Cir. 1970); In re Polycast Corp., 289 F.Supp. 712, 719 (D. Conn.1968). Accordingly, Receiver's preparation for and attendance at hearings on the fees will not be considered in setting his fee. Also, the 49¼ hours similarly spent by Receiver's attorney will not be considered.

Defendant objects specifically to numerous expenses claimed by Receiver's attorney. One group of expenses was objected to as being in connection with efforts to obtain fees for Receiver and his attorney. As discussed in the Court's earlier memorandum at footnote 23, the private investigator's fee was properly incurred and will be allowed. Defendant's objection to the remaining expenses in this group, totaling $1,194.-94, is appropriate, and this amount will not be reimbursed.

Defendant objects to a second group of expenses "if such are in connection with attempts to establish fees." It is apparent, however, that these expenses, most of which accrued after the hearings on fees, involved note collection efforts and other activity appropriately related to the receivership. Such expenses will be allowed. A final group of expenses is objected to because each is not shown to relate to the receivership. The Court finds and concludes that such expenses were reasonably incurred in connection with the receivership and these also will be reimbursed.

The Court finds and concludes that expense items totaling $2,544.46 for Receiver and $10,962.56 for his attorney were reasonable charges for goods and services reasonably required during the pendency of this receivership. Such expenses shall be reimbursed.

The Court finds and concludes that Charles Sapp, his partners and associates expended, 2,562½ hours of service as Receiver's attorney as of December 31, 1973.[1] In addition, the Court is

1.  LIDDELL, SAPP, ZIVLEY & BROWN

Summary of Hours Spent for
E. O. Buck, Temporary Receiver

| Dates | Partners | Associates | Total |
|---|---|---|---|
| 9/6/72–12/2/72 (Final Report) | 801.00 | 471.50 | 1,272.50 |
| 12/2/72–12/12/72 (Reported at Hearing) | 56.00 | 50.75 | 106.75 |
| 12/12/72–5/12/73 (Reported at Hearing—includes 519 hours from First Supplement) | 393.50 | 269.00 | 662.50 |
| 5/13/73–6/12/73 (Reported at Hearing) | 128.00 | 99.00 | 227.00 |
| 6/13/73–12/31/73 (Second Supplement) | 139.75 | 203.25 | 343.00 |
| TOTALS | 1,518.25 | 1,093.50 | 2,611.75 |
| Less time spent in connection with fee matter | | | −49.25 |
| | | | 2,562.50 |

aware of and takes notice of the attorney's efforts since then, particularly with respect to the Barnett matter and note collections.[2]

The fees provided to be paid the Temporary Receiver and his attorney will be set forth in the Order to Terminate Temporary Receivership.

The foregoing constitutes the Court's additional findings of fact and conclusions of law. Fed.R.Civ.P. 52.

The Clerk shall file this Supplemental Memorandum and give a copy to all counsel.

## ORDER DENYING MOTION TO RETAIN JURISDICTION

Be it remembered that on this date came on to be heard, the Application for Payment of Claim of Barnett Mortgage Trust N.A. of Jacksonville, Florida (hereinafter Barnett), Barnett's Motion to Retain Jurisdiction, and the responses of defendant Shearn Moody, Jr., and Receiver thereto; and the Court, having considered the Application, Motion and responses, and being of the opinion that the Application should not be adjudicated in this proceeding but that the Motion to Retain Jurisdiction should be denied for reasons expressed in the Court's Supplemental Memorandum; it accordingly is

Ordered, adjudged and decreed as follows: The claim and application for payment of claim of Barnett Mortgage Trust shall not be determined at this time but that said claim and application shall be and are hereby severed from this cause, Fed.R.Civ.P. 21. The Clerk of the Court shall be and is hereby directed to file a copy of the "Application for Payment of Claim" as a complaint in the next numbered cause of action, to be encaptioned, "Barnett Mortgage Trust N.A. of Jacksonville, Florida v. Shearn Moody, Jr., d. b. a. W. L. Moody & Co, Bankers, (Unincorporated)." Said parties shall be and are hereby given leave to amend their pleadings within thirty (30) days from date. Said cause of action shall proceed to judgment independently of this action.

The Clerk shall file this Order Denying Motion to Retain Jurisdiction, and shall furnish a copy to all counsel.

## ORDER TO TERMINATE TEMPORARY RECEIVERSHIP

Be it remembered that on the 26th day of February, 1974, there came on to be heard in due order the Second Supplement to Final Report, Accounting and Application of E. O. Buck, Temporary Receiver (hereinafter Second Supplement), hearings previously having been had on the Final Report, Accounting and Application of E. O. Buck, Temporary Receiver (hereinafter Final Report), and the First Supplement to Final Report, Accounting and Application of E. O. Buck, Temporary Receiver (hereinafter First Supplement). The Court, having proceeded and considered the Final Report, First Supplement and Second Supplement, all pleadings previously filed herein, all orders and opinions previously entered herein, evidence presented at all hearings herein, arguments of counsel, and all other matters properly before the Court, and having been fully apprised, finds and concludes as follows:

1. The Final Report, First Supplement and Second Supplement should be accepted and approved and the Applications contained therein should be granted.

2. The purposes for which the temporary receivership was established having been substantially accomplished, the temporary receivership should be terminated, effective March 29, 1974 (hereinafter called Termination Date).

3. As explicated in the Court's Memorandum and Order, filed January 16, 1974, and its Supplemental Memorandum of even date, the Court has fully considered and examined the transactions made and actions taken by Receiver, E. O. Buck, and his attorney, Charles Sapp,

2. Receiver's attorney has reported 208¼ hours (111 by partners, 97¼ by associates) spent from January 1, 1974 through February 28, 1974.

Esq., during the course of this receivership. Defendant, Shearn Moody, Jr., has had a full and adequate opportunity to examine the books, records, assets, and premises of W. L. Moody & Co., Bankers (Unincorporated) (hereinafter called Bank). Subsequent to such opportunity, his attorney stated that defendant has no objection or complaints to make concerning such books, records, and premises. Accordingly, the Court concludes that Receiver and his attorney have fully and faithfully discharged all their duties, responsibilities and obligations during the temporary receivership. Their actions should be approved and ratified by this Court. In addition, Receiver, his bonding company (Maryland American General Insurance Company), Receiver's attorney, and their agents and employees should be fully and finally released and discharged from further responsibility and from any and all claims and liabilities in connection with this receivership.

4. The sum of $150,000.00 is a reasonable fee for Receiver. In addition, Receiver should be reimbursed for his personal expenses incurred in connection with this receivership, in the total amount of $2,544.46.

5. The sum of $200,000.00 is a reasonable fee for Receiver's attorney. In addition, Receiver's attorney should be reimbursed for his personal expenses incurred in connection with this receivership in the total amount of $10,962.56.

6. Receiver should obtain invoices for the services of Peat, Marwick, Mitchell & Co. herein and should pay same from the funds in his custody. Payment of the invoices of Peat, Marwick, Mitchell & Co., attached as Exhibit "R" to the Final Report and as Exhibit "O" to the First Supplement should be approved and ratified by this Court.

7. All unpaid expenses incurred by the Receiver during the period of the temporary receivership, as itemized on Exhibit "F" to the Second Supplement, and such other expenses as have been incurred by Receiver in the normal course of business since December 31, 1973, should be paid forthwith by Receiver from the funds in his custody. If unanticipated reimbursable expenses are incurred prior to entry of an order of approval and ratification after Termination Date, same should be paid by Moody out of funds herein ordered to be paid over to him.

8. Claims for expenses allegedly incurred by Bank prior to September 6, 1972, as itemized in Exhibit "D" to the Second Supplement, should not be paid by Receiver, and the responsibility for disposing of such claims should be assumed by Moody.

9. All unpaid claims against the Bank and Moody based on transactions occurring prior to September 6, 1972, including the claim asserted herein by Barnett Bank of Jacksonville, N.A., Jacksonville, Florida, should not be paid by Receiver.

10. Funds held by Receiver for payments of the Outside Depositors of Bank, as itemized in Exhibits "A-1", "A-2", "A-3", "A-4" and "A-5" to the Second Supplement, should be delivered after Termination Date into the Registry of the Court to be paid out upon order of the Court.

11. Funds held by Receiver for payment of the Missing Depositors of the Bank, as itemized in Exhibit "B" to the Second Supplement, should be delivered after Termination Date into the Registry of the Court, to be paid out upon order of the Court.

12. Based upon a showing of Moody's continuing involvement in a banking institution, either W. L. Moody & Co., Bankers (Unincorporated) or any other bank located in Galveston, Texas, in which Moody owns a substantial interest, and upon application by Moody, funds referred to in paragraphs 10 and 11 above should be paid over to such bank, to be held by such bank in trust for those entitled to receive them, on reasonable terms to be provided in the order of the Court authorizing same.

13. Expenses incurred and heretofore paid by Receiver during the course of these proceedings, as itemized in Exhibit "I" to the Final Report, in Exhibit "F" to the First Supplement and in Exhibit "E" to the Second Supplement, where necessary and proper expenses of the receivership and payment of same by Receiver should be ratified and approved by the Court.

14. Expenses of the Bank incurred prior to September 6, 1972, and paid by Receiver, as itemized in Exhibit "G" to the Final Report and in Exhibit "D" to the First Supplement, were necessary and proper, and such payments should be ratified and approved by this Court.

15. Receiver should discharge all responsibilities imposed upon him pursuant to this order. Promptly thereafter, Receiver should file a Final Supplement to the Final Report, accounting for all transactions since December 31, 1973, including transactions and payments authorized and ordered herein. Thereupon, after hearing, such report should be ratified and approved by the Court.

16. All books and records (including the loan portfolio, but excluding such books and records as are specified in the Internal Revenue Service ["IRS"] subpoena involved in Misc. Civil Action No. 72–G–3) of the Bank; the banking premises (including the furniture, fixtures, equipment and furnishings thereof and thereon); and all other assets (excluding those for which provision is made in Paragraphs 10 and 11 above but including other cash and pending lawsuits for the collection of promissory notes) of the Bank and defendant Moody presently in Receiver's possession, custody or control should be delivered to Moody on Termination Date, upon receipt by Receiver of appropriate receipts for such delivery.

17. The records subpoenaed by the IRS should be delivered to Peat, Marwick, Mitchell & Co. on or after Termination Date, with appropriate receipts from Moody and the custodian. Peat, Marwick, Mitchell & Co. should hold such subpoenaed records for the joint custody of Moody and the IRS until such time as the IRS should authorize, in writing, the release of such subpoenaed records to the sole custody of Moody.

Therefore, it is ordered, adjudged and decreed:

1. The Final Report, First Supplement and Second Supplement are hereby accepted and approved and the applications contained therein are hereby granted.

2. The temporary receivership of W. L. Moody & Co., Bankers (Unincorporated) and Shearn Moody, Jr., is hereby terminated, effective March 29, 1974.

3. All acts of E. O. Buck, as Temporary Receiver, Charles Sapp, Esq., as Receiver's attorney, and their agents and employees, heretofore taken are hereby approved and ratified. In addition, E. O. Buck, his bonding company (Maryland American General Insurance Company), Charles Sapp, and their agents and employees are hereby fully and finally released and discharged from any further responsibility herein and from any and all claims or liabilities in connection with these proceedings, except as provided herein.

4. E. O. Buck is hereby awarded the total sum of $150,000.00 as a reasonable fee for his services herein, and the interim fee of $50,000 previously paid to Receiver is credited against the total fee for his services herein, leaving a balance due of $100,000.00. In addition, E. O. Buck is hereby awarded the sum of $2,544.46 as reimbursement for personal expenses incurred by him in connection with these proceedings.

5. Charles Sapp, Receiver's attorney, is hereby awarded the total sum of $200,000.00 as a reasonable fee for the legal services rendered to Receiver in these proceedings, and the interim fee of $50,000 previously paid him should be credited against the total fee for his services herein, leaving a balance due of $150,000.00. Receiver's attorney is hereby awarded the sum of $10,962.56 as reimbursement for his personal expenses

incurred in connection with these proceedings.

6. Receiver is hereby authorized and directed to obtain invoices for the services of Peat, Marwick, Mitchell & Co., herein and to pay same. In addition, payment of the invoices of Peat, Marwick, Mitchell & Co., attached as Exhibit "R" to the Final Report and as Exhibit "O" to the First Supplement is hereby approved and ratified by this Court.

7. Receiver is hereby authorized and directed to pay from the funds in his custody those unpaid expenses itemized on Exhibit "F" to the Second Supplement and such other expenses as have been incurred by Buck in the normal course of business since December 31, 1973.

8. Receiver is hereby directed not to pay the expense itemized in Exhibit "D" to the Second Supplement. Moody is hereby authorized and directed to assume full responsibility for the disposition of such claims.

9. Receiver is hereby directed not to pay any unpaid claims against the Bank and Moody based on transactions occurring prior to September 6, 1972.

10. Receiver is hereby authorized and directed to deliver, after Termination Date, funds held by him for payment of the Outside Depositors of the Bank, as itemized in Exhibits "A–1", "A–2", "A–3", "A–4" and "A–5" to the Second Supplement, and also funds presently held by Receiver for payment of the Missing Depositors of the Bank, as itemized in Exhibit "B" to the Second Supplement, into the Registry of the United States District Court for the Southern District of Texas, Galveston Division.

11. The Clerk of the Court is hereby authorized and directed to dispose of the funds enumerated in Paragraphs 10 and 11 of this Order as hereinafter authorized and ordered by the Court.

12. If defendant Moody reopens the W. L. Moody & Co., Bankers, (Unincorporated), as a commercial banking institution, furnishing substantially the same services as were being furnished at the time of the receivership (other than those prohibited by the consent decree entered herein), and if he maintains and conducts such banking business for thirty (30) days, Moody may apply for the transfer of the funds referred to in Paragraphs 10 and 11 to such bank. If the Bank is not reopened as anticipated by Moody, then Moody may apply for the funds to be so deposited in a bank located in Galveston, Texas, designated by Moody in which Moody owns a substantial interest. In either event, the Court will order such finds to be deposited in trust for the benefit of the owners thereof, upon reasonable terms to be ordered by the Court.

13. Receiver's payment of the expenses itemized in Exhibit "I" to the Final Report, in Exhibit "F" to the First Supplement and in Exhibit "E" to the Second Supplement is hereby ratified and approved in all respects.

14. Receiver's payment of the expenses itemized in Exhibit "G" to the Final Report and in Exhibit "D" to the First Supplement is hereby ratified and approved.

15. Receiver is hereby authorized and directed to pay the fees and expenses provided for herein prior to Termination Date. Thereupon, Receiver shall file a Final Supplement to the Final Report, accounting for all transactions since December 31, 1973, including the transactions and payments authorized and ordered herein.

16. Receiver is hereby directed to deliver, on or after Termination Date, all books and records (including the loan portfolio, but excluding such books and records as are specified in the IRS–subpoena) of the Bank; the banking premises (including the furniture, fixtures, equipment and furnishings thereof and thereon); and all other assets (excluding those for which provision is made in Paragraphs 10 and 11 above but including other cash and pending lawsuits for the collection of promissory notes) of the Bank and defendant Moody presently in Receiver's possession, custody or control to Moody or his attorney here, and

obtain appropriate receipts from Moody for such delivery.

17. Receiver is hereby authorized and directed to deliver the subpoenaed records to Peat, Marwick, Mitchell & Co., on or after Termination Date, and Peat, Marwick, Mitchell & Co. is hereby authorized and directed to receive and hold such subpoenaed records for the joint custody of Moody and the IRS until such time as the IRS authorizes, in writing, the release of such subpoenaed records to the sole custody of Moody and obtains appropriate receipts therefor, duplicate copies of which shall be furnished the Clerk of the Court who shall file same herein.

18. Moody is hereby directed to furnish said receipts for the books and records (including the loan portfolio) of the Bank, the banking premises (including the furniture, fixtures, equipment and furnishings thereof and thereon), and all other assets (including pending lawsuits for the collection of promissory notes) of the Bank of Moody, delivered to him and to Peat, Marwick, Mitchell & Co. by Receiver as provided for herein.

The Clerk shall file this order to terminate temporary receivership and shall furnish a copy to all counsel.